**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Appellee,**

v.

**NATIONAL MEDIATION BOARD et al., National Airlines, Inc., Appellants.**

Nos. 23409, 23412.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1969.

Decided Jan. 30, 1970.

Mr. Walter H. Fleischer, Atty., Dept. of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellants, National Mediation Board, et al., in No. 23,412. Messrs. Morton Hollander and Stephen R. Felson, Attys., Dept. of Justice, also entered appearances for appellants, National Mediation Board, et al., in No. 23,412.

Mr. William J. Curtin, Washington, D. C., with whom Messrs. Robert J. Hickey and Julius Schlezinger were on the brief, for appellant, National Airlines, Inc., in No. 23,409.

Mr. Bernard Dunau, Washington, D. C., with whom Mr. Plato E. Papps, Washington, D. C., was on the brief, for appellee.

Messrs. Francis M. Shea and Richard T. Conway, Washington, D. C., filed a brief on behalf of the National Railway Labor Conference, as amicus curiae, urging reversal.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This appeal concerns the reviewability of a determination by the National Mediation Board that its efforts to mediate a major labor dispute have not proved unsuccessful and that therefore it is not required by section Five, first of the Railway Labor Act, 45 U.S.C. § 155, to terminate mediation and proffer arbitration. The issue is an important one in the context of the Railway Labor Act because while mediation is under way and has not been terminated by the Board, by a proffer of arbitration, employees are prohibited from striking and management is prohibited from making unilateral changes in the terms and conditions of employment. The Act was extended to air carriers by 1936 amendment.

I. *Proceedings in the District Court*

This action to compel the Board to proffer arbitration was brought by the International Association of Machinists and Aerospace Workers, AFL–CIO (sometimes hereafter "IAMAW" or "Union") which since October 31, 1968, has been engaged in a labor dispute with National Airlines concerning the renegotiation of the collective bargaining agreement. The dispute was docketed by the Board for mediation on December 23, 1968. In the District Court proceedings the Board insisted that it could not

be compelled to state the reasons why it felt that efforts to secure an amicable settlement through mediation had not proved unsuccessful in as much as (1) the District Court had no jurisdiction to review the Board's determination, and (2) it would be destructive of the mediation function of the Board to require it to justify its decision to continue with mediation. The District Court, however, was of the view that "there has been sufficient indication that these mediation efforts may be unsuccessful that the Mediation Board should not any longer proceed without acquainting the Court in prompt fashion and in detail as to the reasons why it may feel mediation will be successful, if that is its view." The Board was ordered to respond to interrogatories, which had been filed by the Union,[1] that asked the basis on which the Board believed efforts to mediate might still be successful.

On August 4, 1969, a hearing was held on cross-motions for summary judgment. Francis A. O'Neill, Jr., Chairman of the National Mediation Board, was present in the court room. The District Judge announced at the outset that he had some concern about the adequacy of the affidavits filed by defendants and wished to address some questions to a Board member. He thereupon discussed with Mr. O'Neill various aspects of the process of mediation and the function of the Board therein. Counsel for the Board objected, however, to questions by the Court seeking to discover the Board's basis for its decision not to proceed to arbitration in the case at bar. The Court then advised counsel that the Board's answers to the Union's interrogatories had been unresponsive and that the Court was prepared to resolve the issue in favor of the Union if the Board was unwilling to explain its actions. Mr. O'Neill was asked no further questions.

1. On June 20 the District Court granted the Board's motion for a protective order to the extent that the Board, while required to give "full and informative responses" would not be "required to an-

swer in such specificity that in the opinion of the defendants details given will substantially interfere with the mediatory process."

On August 15, 1969, the District Court entered its judgment ordering the Board to proffer arbitration and discontinue its attempt to bring about a settlement of the controversy by mediation. In its memorandum opinion of August 7, the Court concluded that it had jurisdiction to compel the Board to act where there exists a clear violation of the statutory provision, requiring the Board to proffer arbitration when mediation is exhausted, by reason of the Board's patently arbitrary refusal to act; that the Union affidavits showing that mediation was being continued although 97 issues remained unresolved after 48 mediation sessions and 179 hours of talk made out a prima facie case of patently arbitrary action; that when the Board is responsibly accused of having abused its powers, it must answer the Court or take the consequences; that the Board had refused to justify its conduct, its answers to the Union interrogatories being unresponsive and consequently stricken under Fed.R.Civ.Pro.Rule 37(b) (2) (i); and that, standing alone, the affidavits filed and showing made by the Union entitled it to summary judgment.

## II  *Overview of the Controversy*

### *The Labor Dispute*

The IAMAW is the certified representative for approximately 1,350 mechanical, stock room and related employees of National Airlines. The last collective bargaining agreement between the company and the Union was entered into on August 25, 1966, terminable on December 31, 1968 on sixty days notice by either party. On October 31, 1968, both National and the Union exchanged notices of proposed changes in the terms of this agreement. These also served as notices given pursuant to § 6 of the Railway Labor Act, 45 U.S.C. § 156, which requires, inter alia, 30-day notices and collective bargaining in case of a major labor dispute between a carrier and its employees. National noticed proposed changes in 17 of the 25 Articles of the agreement. The Union proposed changes in 21 Articles and in addition proposed the establishment of a pension plan. In all 162 separate notices were exchanged. Some of the topics are indicated in the footnote; they serve to evidence the wide range of matters involved.[2]

2.
Article II: Scope of Agreement
    National: Emergency use of other employees
    IAMAW: Sub-contracting
Article III: Status of Agreement
    National: Status of employees who refuse to cross picket lines.
Article IV: Classification and Work Requirements (Mechanical Group)
    National: Changes or clarification in five job descriptions; one new job classification.
    IAMAW: Changes or clarification in two job descriptions; six new job classifications; availability of inspectors; apprentice program; pay increase; license premium; line service premium; high-cost-of-living area adjustment; elimination of progression steps.
Article V: Classification and Work Requirements (Stock Room)
    National: Changes or clarification in three job descriptions.
    IAMAW: Changes or clarifications in three job descriptions; job assignment bidding; pay increase.
Article VII: Cost-of-living escalator
    IAMAW: Change
Article VIII: Severance pay
    IAMAW: Employment lost because of merger
Article IX: Hours of service
    National: Covering absent employee; annual bidding; use of part time employees.
    IAMAW: Length of shift; starting hours; Saturday and Sunday premium; emergency changes.
Article X: Overtime Compensation
    National: Rate
    IAMAW: Rate; travel time; rights of by-passed employee

*Negotiations, Mediation and other Proceedings Prior to the Filing of the Complaint Seeking Proffer of Arbitration*

The various § 6 notices were discussed at meetings between IAMAW and National on November 12, 13, 14, 15, and 18, 1968. Although these meetings provided an opportunity for clarification of proposals and some substantive discussions, it was decided "to recess until December 9, 1968, when we will get down to serious negotiations." When on that date at 10 a. m. negotiations resumed, the Union at the outset charged National with having made a unilateral change in the conditions of employment by using employees outside the class represented by the IAMAW to perform work claimed by the Union. National suggested that this issue should be resolved through existing grievance procedures; the Union stated that this response was unacceptable and that in view of National's attitude it considered negotiations to be deadlocked and further conferences useless. The Union then withdrew from the conference and that day wired the Company that it deemed "negotiations between National Airlines and the IAMAW deadlocked as of 10:07 this date."

Article XI: Holidays
    National: Pay schedule
    IAMAW: Pay schedule; number of holidays
Article XII: System Service
    National: Clarify
    IAMAW: Applicability of overtime rate; rest upon return
Article XIII: Seniority
    National: Probationary period; rebidding; cause for loss of seniority
    IAMAW: Union consent to combined, new or different shops
Article XIV: Filling Vacancies
    National: Probationary period; temporary vacancies and reassignment
    IAMAW: Seniority basis for transfer; vacancies which must be filled
Article XVI: Vacations with Pay
    National: Accrued vacation credit
    IAMAW: Duration, splitting, accrued vacation credit
Article XVII: Sick Leave
    National: Free and reduced rate transportation while on; reporting reasons for absence, injury or illness for which sick leave will not be paid.
    IAMAW: Accrued sick leave credit
Article XVIII: Occupational injury leave
    IAMAW: Rewrite
Article XIX: Maintenance of Privileges
    IAMAW: Longevity pay
Article XX: Transportation
    IAMAW: Transportation for employees on vacation, employees traveling on union business, system General Chairman and his family.
Article XXI: Bargaining and Grievance Procedure
    National: Number of stewards; number of steps; number of witnesses to be called; Time to be spent in investigating grievances.
    IAMAW: Complete overhaul
Article XXII: Safety and Health
    National: Required physical exam on return from sick leave
    IAMAW: Option of employee to wear hard hat; availability of doctor and/or nurse and ambulance; safety committee; provision for cold weather gear.
Article XXIII: General and Miscellaneous
    National: "Outside" employment without company permission shift premium for day-off work; notification of employee change in address.
    IAMAW: Shift premiums; rate of pay for training waiting time; insurance; condolence leave; jury duty; doctor, hospital and dental care; on-job parking; reimbursement for insurance premiums owed on last contract; uniforms.
Article XXV: Effective Date and Duration:
    National: Three years
    IAMAW: Two years; retroactive pay; separate agreement for stockroom employees to be ratified by them separately.

On December 16, 1968, National applied for the services of the National Mediation Board, and the Board docketed the dispute on December 23.

Shortly thereafter the Company and the Union became involved in controversy concerning an order issued by the carrier reducing the number of men needed to taxi an aircraft from three to two. The controversy led to the use of self-help by both parties to the dispute. The course of events, fully set out in the opinion of the Fifth Circuit in National Airlines, Inc. v. IAMAW, 416 F.2d 998 (September 23, 1969), may be summarized as a sequence of escalating responses: the refusal of three employees to taxi aircraft, their discharge by the carrier, a wildcat strike by the employees, and the carrier's firing of approximately 940 workers who were members of IAMAW.

The Fifth Circuit held that although National may have been entitled under the Act to some self-help when faced with an illegal strike over which the Union had lost all control such defensive self-help was permissible only to the extent necessary to maintain uninterrupted carrier service. National, the court concluded, though entitled to replace strikers and not rehire those replaced, had exceeded the bounds of permissible self-help because the mass discharge of strikers was not needed to restore service. The case was remanded to the district court for determination of the precise extent to which the carrier exceeded the permissible bounds of self-help.

On January 27, 1969, six days after the issuance of a second injunction against the wildcat strike by the U.S. District Court for the Southern District of Florida, and five days after the mass discharge of employees by National, the President of the Union wired the Board to protest the Board's failure to assign a mediator and to insist that it immediately "make a proffer of arbitration of this dispute."

On February 27, 1969, the Union commenced an action in the U.S. District Court for the District of Columbia, complaining of the Board's failure to assign a mediator, and March 3 moved for a preliminary injunction to require the Board to make an assignment. On March 5, prior to a ruling on this motion, the Board assigned mediator Arthur J. Glover to the dispute. He met separately with the parties on March 10, 11 and 12. On March 11, the Union again requested a proffer of arbitration and on March 13, the Board advised the parties that mediation was being temporarily recessed so that the status of the case could be reviewed with the mediator in Washington. On March 24, the Board advised the parties that mediator R. K. Quinn would replace mediator Glover and that he would begin mediation in Miami on March 31. The Board urged the parties to engage in direct collective bargaining pending his arrival.

Between March 31, and April 7, Mediator Quinn met separately with the parties. Joint mediation sessions began on April 10. The agenda for discussion consisted of five items selected by Mediator Quinn. These items were discussed on April 10, 11 and 15. On April 16 and 17, the sessions were devoted to the scope of the agreement (subcontracting) issue. Counterproposals by National on two of the agenda items were taken up on the 22nd and 23rd. On the 23rd the Union amended its complaint to seek an order directing the Board to proffer arbitration.

*Mediation Subsequent to the Filing of the Amended Complaint*

Discussion of the five agenda items continued until May 5. Between May 5 and June 19, with a recess from May 16 to May 26, "non-money" notices were taken up. The parties discussed money issues at sessions between the 19th and 30th of June. As of June 30, the parties had spent 179 hours in 48 joint sessions and had discussed many notices only once. As of that time approximately 40% of the notices had been resolved. After the last economic issue had been reached for initial discussion, the Union representative stated that further at-

tendance at mediation sessions would be fruitless and that the Union did not intend to participate further. On July 1, the Board recessed mediation pending a full review of the status of the dispute. On July 25, the Board informed the parties that Mediator Quinn would resume mediation in Washington on August 7. However, on August 4, the District Court ordered the Board to proffer arbitration. On August 26, this Court entered a stay order, and on September 10 it continued the stay, "to permit the Board to continue the mediation process" pending appeal. This appeal was expedited.

### III. Preliminary Statement of Opposing Positions on Jurisdiction

To help provide perspective for the various issues this opinion considers, it may be well to offer a preliminary statement of the opposing views of the parties on the issue of jurisdiction of the District Court and this court to consider the controversy.

In brief, the Union contends that the District Court rightly held it had jurisdiction because of general considerations of law, evolved by the courts and confirmed by the legislature, that the courts are open to consider a complaint by an injured party that a Federal official or agency has failed to discharge his or its duty, as delineated by Congress and the Constitution, and may be ordered to take the action required by law which has been wrongfully and unreasonably ignored or delayed.

The Board and National contend that this is a general rule that is subject to exception, that one of the exceptions intended by Congress and validated by the courts is to preclude judicial intrusion into the special machinery established by the Railway Labor Act for the pacific settlement of carrier-labor disputes, a doctrine that limits judicial jurisdiction in order to preserve the viability of the special agencies and procedures established by the Act.

### IV General Pattern of the Railway Labor Act

Important to the disposition of the issues before us is an understanding and review of the general patterns of the Railway Labor Act and its special machinery and procedures.

The major purpose of Congress in passing the Railway Labor Act was to "provide the machinery to prevent strikes" and the resulting interruptions of interstate commerce. Detroit & Toledo Shore Line Ry. Co. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (Dec. 9, 1969); Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). Its provisions do not spell out limitations on the way in which economic warfare is to be conducted; rather the preventive thrust of the Act is reflected in its concern with use of conciliation, mediation, and arbitration to settle labor disputes short of resort to any form of self-help. The Act establishes different machinery for the resolution of "major" and "minor" disputes. Minor disputes, like disputes over the interpretation of collective bargaining agreements, are subject to compulsory arbitration by the Boards of Adjustment which the Act creates. Major disputes, those arising out of the effort to create and change collective bargaining agreements, are left to machinery of noncompulsory adjustment under the general supervision of the National Mediation Board.

This machinery was succinctly described by Justice Harlan in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344:

"The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the

dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10."

As the Supreme Court has noted on numerous occasions, these procedures are purposefully long and drawn out. Congress desired to avoid compulsory arbitration concerning the content of collective bargaining agreements, and therefore imposed on the parties to a labor dispute the obligation to "make every reasonable effort" to settle disputes without interruption of interstate commerce. When even the drawn out processes of the Act have failed to result in agreement, Congress has on rare occasions been willing to provide for an interim compulsory settlement. Brotherhood of Ry. Trainmen v. Akron & B. B. Ry. Co., 128 U.S.App.D.C. 59, 385 F.2d 581 (1967), cert. denied, Brotherhood of Locomotive Firemen, etc., 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

The most recent Supreme Court discussion of the machinery for the resolution of major disputes is in Justice Black's opinion for the Court in Detroit & Toledo Shore Line v. United Transportation Union, supra. He notes that a "crucial aspect of the Act was the power given to the parties and the representatives of the public to make the exhaustion of the Act's remedies *an almost in-* *terminable process.*" 90 S.Ct. at 299. (Emphasis added) This aspect of the Act is "crucial" because, like the ultimate threat of a strike, it is a force tending to encourage compromise and settlement. The opinion states explicitly:

> [S]ince disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives to the other party to preserve the status quo for a long period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

## V  *Jurisdiction for Judicial Scrutiny of Review Board Conduct*

Focusing on the particular phase of the Railway Labor Act pattern that requires the parties to engage in the process of mediation by and with the National Mediation Board, we must at once take note, as the District Court rightly recognized, that the mediation process is subtle and delicate. There would be grave damage to a process of major significance in the maintenance of industrial peace in the nation's strategic transportation industry if the courts assumed that this agency was subject to the same kind of judicial scrutiny as is provided in the case of other officials and agencies. Yet this does not necessarily mean that the courts are completely deprived of any scrutiny whatever of the Mediation Board.

The rule of law applicable in today's industrial society has important intermeshing aspects.

Activities that at one time were considered within the domain of self-determination by our citizens, essentially subject to restraints only of their wisdom and prudence rather than of officials, are now increasingly accepted as requiring restrictions, in order to protect the public interest, imposed and enforced by broad mandate of the legislature, specific action of executive officials, and in some cases decrees of the courts. The

rule of law requires obedience to these commands. The rule of law also ensures, at least generally, that the courts are open to inquire into the validity of the actions of the various officials and agencies who have necessarily been entrusted by the legislature with broad authority to define and regulate economic activities. There are exceptions born of necessity, as in the case of determinations in the area of foreign relations and national defense, that do not involve constitutional issues. The general doctrine that courts are open to entertain complaints that officials have exceeded their authority is, however, not only deep-rooted in history, but very much alive, as is clear from recent decisions expanding access to the courts.

The breadth and vigor of court doctrines has been powerfully reenforced by the enactment by Congress in 1946 of the Administrative Procedure Act which was invoked by the District Court. This is a legislative declaration and mandate that establishes beyond dispute a "basic presumption of judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Curran v. Laird, 136 U.S.App. D.C. 280, 420 F.2d 122 (November 12, 1969) (en banc). Section 10(a) of the Act, now codified as 5 U.S.C. § 702, expressly provides: "A person suffering legal wrong because of agency action * * * is entitled to judicial review thereof." Section 10(e) of the Act, now codified as 5 U.S.C. § 706 provides: "The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

The issue is whether the general and presumptive jurisdiction of a court to consider whether an agency's action has been unlawfully withheld or delayed,[3] has been negatived in the case of the National Mediation Board by reason of a special legislative intent, discernible in its establishment, arising out of the agency's special nature, responsibilities and requirements.

In certain aspects of the Railway Labor Act Congress created rights which were made enforceable by the National Mediation Board, without provision for direct judicial review even on an allegation of error of law or abuse of discretion.

The leading case is Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), which held that the District Court was without jurisdiction to review the Board's action in issuing a certification of the representatives of a carrier's employees for collective bargaining. The Court was there concerned with § 2, Ninth—inserted into the Act in 1934. That section was aimed in part at jurisdictional disputes, and its draftsman, Commissioner Eastman, explained that it was important "to provide a neutral tribunal which can make the decision and get the matter settled." The Court found that the intent was plain to make that agency certification finding "the last terminal point." "There was to be no dragging out of the controversy into other tribunals of law." (320 U.S. at 305, 64 S.Ct. at 99).

The jurisdictional exception wrought in the *Switchmen's Union* case turns on certain salient features of the administrative action involved. The plaintiff union was seeking to vindicate a right created by Congress, the right of a majority of a craft or class to determine its representatives for bargaining under the

3. The claim of unlawful or unreasonable delay establishes court jurisdiction even though there has been no final agency order, and the relief sought is e. g. an order requiring the agency to hold a hearing. Kessler v. FCC, 117 U.S.App.D.C. 130, 141, 326 F.2d 673, 684 (1963); Harvey Radio Laboratories v. United States & FCC, 110 U.S.App.D.C. 81, 289 F.2d 458 (1961).

Act. That "right" is protected by § 2, Ninth, which gives the Board the power to resolve controversies. A court review of the Board's determination "is not necessary to preserve or protect that 'right.' Congress for reasons of its own decided upon the method for the protection of the 'right' which it created." 320 U.S. at 301, 64 S.Ct. at 97.

In sum, the exceptional legislative intent of finality for the kind of administrative determination involved in the Board's certification of a representative was discerned in the *Switchmen's Union* opinion from three conjoining elements —the source of the pertinent rights in an act of Congress; confidence that they could be fully and reasonably vindicated by the agency, without need for court involvement, and the need for expedition in determination. The need for expedition was crucial, since there is at least a suggestion that the kind of determination made could be subject to judicial reexamination in some aspects, at a later time when the need for immediacy had passed.[4]

Forceful considerations are presented by the Mediation Board for its view that the principle underlying *Switchmen's Union* is applicable to the kind of agency action, or perhaps inaction, involved in continuation of the mediation process and refusal to proffer arbitration.

In the case at bar these considerations are properly taken into account not in determining an administrative absolutism or total immunity from judicial review, but in defining and confining the kind of judicial scrutiny that may be provided by the courts, so as to avoid imperiling the heart of the legislative program.

Even in the area of *Switchmen's Union* the administrative absolutism has not been absolute. An exception to the rule of immunity has been carved out and jurisdiction of the courts established, where the papers establish on their face a plain violation by the Board of a statutory command which warrants immediate intervention of an equity court.[5]

The present case has been filed by a union that is asserting not merely a statutory right but the basic right to use economic weapons in a labor dispute. There are constitutional as well as common law underpinnings of the rights of employees to strike, and engage in peaceful picketing, in order to improve terms and conditions of employment. Employers have correlative rights to institute changes deemed necessary for survival.

The rights of self-help owned by both union and management have been deliberately preserved by Congress, albeit held in temporary abeyance. They survive, available for use when the statutory procedures to promote agreement are exhausted.

They are indeed in a sense symbols of freedom, reminders that even though their occasional exercise and the disorder of industrial warfare may be vexing to the point of distress the underlying freedom is more productive of a healthy

---

4. In Brotherhood of Railway & S. S. Clerks v. Ass'n for Benefit of Non-contract Employees, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965) the Court limited its review of the Board's resolution of a representation dispute to the question whether the Board had fulfilled its statutory duty to investigate the dispute. The Court noted, however, that the keystone case dealing with nonreviewability under the Railway Labor Act, Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), suggests that broader review is called for when a court is asked

to enforce the statutory command to bargain with a certified representative. 380 U.S. at 661 n. 2, 85 S.Ct. 1192. Cf. Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) (NLRB order in certification proceeding reviewable where an employer's refusal to bargain results in an unfair labor practice charge.)

5. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); Internat'l Bro. of Teamsters v. Brotherhood of Ry., A. & S. Clerks, 131 U.S.App.D.C. 55, 64, 402 F.2d 196, 205 (1968).

and vigorous economy and nation than a structure of economic regimentation and dictated order. That at least is the premise of the Railway Labor Act, as Justice Harlan recently pointed out in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

> Implicit in the statutory scheme [of the Railway Labor Act] is the ultimate right of the disputants to resort to self-help—'the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration.' We have consistently so held in a long line of decisions. [citations omitted]

The Railway Labor Act taken as a whole does not fairly require the conclusion that the courts are without jurisdiction to provide a remedy if the Board continues mediation on a basis that is completely and patently arbitrary and for a period that is completely and patently unreasonable, notwithstanding the lack of any genuine hope or expectation that the parties will arrive at an agreement. Any such view of the act as removing judicial jurisdiction would raise serious constitutional questions. The legislature has latitude to impose a solution, by specifying a reasonable procedure and public tribunal that is binding upon parties unable to reach an agreement.[6] But a rule of absolute immunity from judicial inquiry for the National Mediation Board would be tantamount to requiring the parties to stay frozen for an indefinite period even though no relevant public process was underway.

There are two distinct features of the Act that merit analysis. First are the various provisions that set forth specific cooling-off periods, carefully circumscribed and limited in time dimension for freezing of the status quo. Thus section six, 45 U.S.C. § 156, authorizes a change in the status quo if mediation services have not been requested or proffered within ten days after the termination of bargaining between the parties. Section five limits to thirty days the cooling-off period provided following a party's rejection of an arbitration procedure. Another cooling-off period may be inserted if the dispute poses such a threat to interstate commerce as to warrant the creation of an emergency fact finding board pursuant to section ten, 45 U.S.C. § 160, but even in that emergency condition the emergency board must report to the President within thirty days, and the freeze on status quo that must be maintained following its report is limited in time to thirty days.

A markedly different characteristic of the Act is the lack of any time span as a limit on the processes primarily relied on for settlement of differences—negotiation between the parties; mediation; arbitration (where agreed). These go on until they have run their course. The fact that much time is required for them to run their course, far more certainly than the 10-day, 30-day and 60-day specific periods already referred to, is only confirmation that in the overall the Act retains the primary characteristic of purposefully drawn out procedures. In Justice Black's vivid phrase, the parties and public representatives have been given the power "to make the exhaustion of the Act's remedies an almost interminable process."

This consideration bears powerfully on the limited nature of judicial scrutiny that is appropriate, and the need for utmost restraint before the court exercises a power to terminate a process that has not been terminated by a public agency. This perspective does not lead, however, to the conclusion that the process is indefinitely interminable, on the say-so of the agency alone, at least where the court may, as we think it can, reconcile both in theory and in practice

---

6. Brotherhood of R. R. Trainmen v. Akron & B. B. R. Co., 128 U.S.App.D.C. 59, 68, 385 F.2d 581, 590 (1967), cert. denied 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

a limited power of scrutiny that avoids the threat of administrative absolutism, but does not abort or trammel the administrative process.

## VI *Restricted Scope of Available Judicial Scrutiny and Procedures*

Restricted and constrained is the ambit of scrutiny and procedures that may properly be made available by and in the courts consistently with the purpose and contemplation of the Railway Labor Act.

■ 1. We begin by saying that this kind of judicial scrutiny is much more tight and narrow than that resulting from the conventional principles of judicial review. Those principles reject an administrative action that is not accompanied by a statement of reasons, for that is a primary requirement for validity of the kind of administrative determinations made after formal procedures. WAIT Radio Corp. v. FCC, 418 F.2d 1153 (June 24, 1969).

These general requirements of the conventional administrative process, usually accompanying an evidentiary hearing and determination with adjudicatory aspects, cannot be imported wholesale into an administrative process as special and unique as mediation. The statement of reasons is a feature of what has been termed the judicialization of the administrative process.[7] The rule of law, however, has room for procedures for the resolution of differences by means other than the techniques that are the hallmark of the judiciary, notably the application of general principles to particular facts. The accommodation of differences in concrete compromises without the need for invariant application of principle is often the salient element in the process of mediation. We pause to note that this may also be said of the process of negotiation, whether among businessmen or between business and labor, among legislators making the legislative process work, or for that matter in the conduct of public agencies and even courts of the process of settlement [8] which is an essential feature of the resolution of controversies in our society. It is because the mediator acts as a catalyst for settlement rather than a judge that the Supreme Court was minded to say—"The concept of mediation is the antithesis of justiciability." General Committee of Adjustment v. M.K. T.R. Co., 320 U.S. 323, 337, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943).

2. Nor may an approach to judicial scrutiny of the Mediation Board be fashioned along the same lines as may be feasible for other agencies which may be called for an explanation subsequently even as to matters not required to be accompanied by a contemporaneous statement of reasons, as in the case of agencies required to defend against a claim that they have unreasonably delayed setting a matter for hearing (*supra*, note 3).

A key element of the mediation process that the legislature contemplated is a process essentially private, rather than public, in its structure.

The Railway Labor Act of 1926 was drafted by a committee representing railroads and railroad unions, and was supported by both management and labor.[9] The committee hearings reveal the essential ingredients and underlying philosophy of the proposal expressed by the principal spokesman for both labor and management. The mediation board is to operate in private conferences, not public sessions. The board will confine

---

7. Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367, 371 (1968).

8. "The parties may be disposed to avoid the expense and distractions of litigation if the various rates reached in a settlement do not constitute a binding admission or ruling on principle." City of Chicago v. FPC, 128 U.S.App.D.C. 107, 119, 385 F.2d 629, 641 (1967).

9. See Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 563–564, 50 S.Ct. 427, 74 L.Ed. 1034 (1930).

itself to the function of conciliation and persuasion, exerting its good offices to bring the parties together. It will not make findings, or even statements to the public, for these would undercut its status as a body recognized by both sides as impartial, and would impair its ability to constitute a significant force for conciliation, not only in the particular case, but in general and in the future.[10] Stressed and restressed was the need to retain the board in a position where it could operate by conciliation and persuasion, and the view that this position would be undercut if it gave statements or opinions, for the party standing condemned by the thrust of such a statement would or at least might conclude that the board was being unfair.

A proposal to give the mediation board the power to report facts was considered and rejected in a management-union conference "because it is desired to keep the mediation board in the condition where it is persona grata to both parties."[11] In short, as one witness trenchantly put it: "The public would like to have this controversy settled far more than to have a statement given out as to why it could not be settled." [12]

3. While the court is available to let in some light on the mediation process, its role of surveillance is limited, and it must take care to avoid a broad beam of light that destroys a photograph still in process of development.

Specific delineation of the restricted role of the court may be presented by reference to the proceedings in the District Court in this case. In its consideration of the motions for summary judgment the District Court sought to supplement the affidavits filed as to the mediation process by requiring the Mediation Board to acquaint the Court "in prompt fashion and in detail as to the reasons why it may feel mediation will be successful, if that is its view."

10. The principal spokesman for labor, Donald R. Richberg, and the principal spokesman for management, A. P. Thom, testified that:

"Now the board of mediation is intended to continue to be regarded by both parties as an impartial body whose services will be valuable, and bring them together. * * * They must continue with their powers of conciliation unimpaired, and they could not do that if they are to render judgment. So that there never was a purpose to make the board of conciliation a fact-finding commission or to have a report on the merits." Senate Hearings, at 13 (Thom).

"* * * The board of mediation, to preserve its ability to mediate year after year between the parties, must not be given any duties to make public reports condemning one party or the other, even though the board may think one party is wrong. That is the fundamental cause of failure of the Labor Board. * * * The board of mediators should never make any reports to the public condemning one party or the other. Their duty is that of remaining persuaders. * * *" House Hearings, at 18 (Richberg).

"They [mediators] are in a confidential capacity, and it is highly important that they should be so regarded * * *. There are many, many cases where the mediators had locked in their breasts secrets that they could not possibly divulge to the other side, when they knew how far one party would go and how far the other party would go, and were trying to get them together, until finally they had gotten them to the line where they could say, 'You have agreed to this, and the other fellows have agreed to this. Now, sign,' and they could not possibly at any time let either party know how close they were together * * *" House Hearings, at 87–88 (Richberg). Hearings on H.R. 7180 before House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess. (1926); Hearings on S. 2306 before Senate Committee on Interstate Commerce, 69th Cong., 1st Sess. (1926).

11. Once a board makes a report "The next mediation will find one party or the other offended with their action." Hearings before Sen.Comm. on Interstate Commerce on S. 2306 (Railway Labor Act), 69th Cong., 1st Sess. (1926), p. 13, remarks of Mr. Thom.

12. Id., at 85, statement of Mr. Richberg.

An amendment provided a protective order that the Board "while still required to give full and informative responses to the interrogations, shall not be required to answer in such specificity that in the opinion of the defendants details given will substantially interfere with the mediatory process." At oral argument on the motion the District Court put questions to the Chairman, who happened to be present, as to the reasons for the Board's decision to continue with mediation and not to proceed with arbitration. The persistence of Board counsel in submitting that this was beyond the proper purview of the court led to its order striking the Board's interrogatories as unresponsive and to the ultimate order requiring the Board to offer arbitration.

In our view the District Court's approach was beyond the scope of restricted judicial scrutiny available in this kind of case. The District Court was aware of the problem, as appears from its effort to cope with the matter in the protective order. But the difficulty is not merely the injury to the mediatory process in any particular case. There is a broader concern, that inquiry by courts as to the reasoning process of the Mediation Board in regard to maintenance of mediation is destructive of the mediation process in general, including future cases not yet born. For there is interwoven with the conduct of the mediation process some judgment, born of experience and intuition, that calculates the possibility of settlement in the light of an assessment of motives and possibly even bona fides of the conduct of each party. Any candid response to inquiry as to reasons, whether put by party or court, might well require a revelation that, once made, would change the position and status of the Board irretrievably, and in a way that violates the legislative intent. This is the philosophy underlying the mediation provisions inserted in this statute.

■■ The court can do no more than elicit objective facts concerning the conduct of the mediation process. Here some such facts were put forward by the Union, others by the intervenor carrier. The court had before it data as to the number of mediation meetings held during approximately the first six months of 1969. It had information as to the number of issues involved in the controversy, and broached at these meetings. It could rely only on such objective data, and must give the Board the benefit of any doubt as to possibilities why such data might fit into a picture that the Board could genuinely conclude might lead to successful negotiation. The members of this Mediation Board are no more to be called to the courthouse to explain their undisclosed reasons for action than the members of a legislature. The Mediation Board is entitled to as strong a presumption as the legislature, that if any state of facts might be supposed that would support its action, those facts must be presumed to exist. It has long been the law that the presumption of constitutionality available to a legislative enactment is also available to an administrative regulation.[13]

■ This doctrine has been dormant for some time, at least for Federal agencies, in view of the superimposed doctrines of administrative law requiring the agencies to set forth considerations justifying adjudications and regulations. In the case of the Railway Mediation Board's continuance of mediation, however, the same kind of presumption has full validity and the stringent burden cast on the party assailing the administrative action cannot be lightened. In the case at bar the administrative course, supported by the comprehensive presumption, could not rightly be overturned by the District Court.

---

13. Pacific States Box and Basket Co. v. White, 296 U.S. 176, 185–186, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853 (1935); see Note, The Presumption of Constitutionality Reconsidered, 36 Colum.L.Rev. 283 (1936).

At the time of the hearing and argument in August, 1969, the District Court had before it objective facts which are sufficient to show that circumstances might well be supposed to support the Board in refusing to proffer arbitration and determining to continue with mediation. The amount of time already spent in mediation was more than customary. But it was shown that this dispute involved a large number of issues, some of them complex, and that the time required to mediate successfully other difficult cases had been even greater. Some of the various issues had only been discussed once, and in particular, economic issues had been discussed only since June 19. Agreement had been reached on a number of the issues to which substantial time had been given in mediation conference—overall approximately 40% of the issues had been resolved. The Court was made aware that it had been necessary for the Board to assume mediatory jurisdiction before the parties had made any significant effort to hammer out their differences in conference between themselves. The situation was clouded by the fact that prior to August 4, both the carrier and the Union had resorted to illegal self-help.

We are not unmindful that the Mediation Board began its handling of the matter with a delay that ill suits its need for expedition.[14] There was delay, too, when one mediator was substituted for another—but sometimes such a change is vital to the success of the process, and the quick recognition by the Board of need for a change may be to its credit rather than otherwise. Moreover, the Board Chairman may not have been completely familiar with the details of this case, and one gets the impression that this was part of the disenchantment of the District Court. But he did not come to the August hearing prepared to recite, so to speak, and an agency with as many matters to consider as this one cannot be primed on details at all times. The matter might stand in different posture if the Board had not consulted with the mediator, but here they did consult with the substituted mediator and it was only after such consultation that it decided that mediation had not been exhausted.

It may well be that the likelihood of successful mediation is marginal. That success of settlement may lie in the realm of possibility, rather than confident prediction, does not negative the good faith and validity of the Board's effort. The legislature provided procedures purposefully drawn out, and the Board's process may draw on them even to the point that the parties deem them "almost interminable."

What is voluntary about mediation, including mediation under this Act, is the decision to accept or reject the result available from the mediation process. What is involuntary about mediation under this Act is the obligation to engage in the mediation process even though a party is not unreasonable from his point of view in his conviction that further mediation is futile. The court's inquiry cannot go beyond examination of the objective facts and determination thereon whether there is a reasonable possibility of conditions and circumstances (including attitudes and developments), available to the Board, consistent with the objective facts, sufficient to justify the Board's judgment that the possibility of settlement is strong enough to warrant continuation of the mediation process. However skeptical of success the court may be it cannot obliterate even the slim chance of success that may ensue from exhaustion of the process entrusted by Congress to the Mediation Board. In this case the District Court took into account considerations that we think are inadmissible. We cannot conclude that if it had conducted an inquiry

---

14. Although the dispute was docketed by the Board on December 23, 1968, a mediator was not assigned until March 5, 1969. It would not be unreasonable, however, for the Board to believe that fruitful mediation could only begin after the illegal use of self-help had stopped.

that was limited to the objective facts and confined by the narrow standard of review outlined herein that it would have been impelled to reach the conclusion that the mediation process had been exhausted.

▮▮▮ 4. The considerations developed to this point might warrant a remand for fresh consideration by the District Court without the taint of its improper ruling in calling on Board members for reasons and striking Board interrogations in view of the failure to respond. But there is another aspect to the case, important to set forth in view of the Congressional purpose, which requires reversal without remand. The point is, simply, that in an action based on the invalidity of the Mediation Board's refusal to terminate the mediation process, the issue of validity must be determined by reference to the facts existing as of the time the complaint is filed.

The mediation conducted after filing of the complaint under the shadow of litigation overhanging the Mediation Board is not the kind of mediation envisaged by Congress in § 5 of the Act. Its failure or inconclusiveness does not demonstrate similar lack of success for a mediation process conducted without the artificial pressure and distortion of an overhanging litigation. A party that brings a court action may well acquire a stake in showing that mediation won't work.

The already heavy burden on a party who resorts to the courts to set aside administrative conduct is heightened enormously in the case of the Mediation Board by the doctrine requiring that a complaint charging unlawful failure to terminate mediation be determined by reference to the facts as of the date the complaint is filed. Litigation time does not count as mediation time. This helps assure that a party will not go into court out of mere resentment or pique over delay in mediation. If the court finds no invalidity in the mediation process as conducted, resort to the courts may only prolong the duration of the statutory procedures. This doctrine is a powerful offset to any fear that the announcement of District Court jurisdiction will open the gates to a tide of actions that will drown the Board. Under the doctrine here announced, it is fair to expect that only the rare and exceptional case will be brought to court.

As of April 23, 1969—when the complaint of IAMAW was amended to allege the claim that the Mediation Board was unlawfully refusing to terminate the mediation process—the objective facts plainly did not overcome the presumption of validity. For this unusual type of claim, the District Court may not properly entertain a complaint cast in merely conclusory terms. The complaint is subject to dismissal for failure to state a claim unless it alleges whatever plaintiff considers to be the objective facts known about the mediation. The context of this case, whether established on the face of the complaint, or adduced on particulars or by defendants, is of a mediation wherein, as of the date of complaint, the issues had not yet even been stated for the first time by the parties meeting in mediation context. In that context the complaint was subject to dismissal with prejudice forthwith.

The management of such actions, if brought, calls on the District Court to proceed with care in view of the sensitive functions of the Mediation Board. If it appears from the complaint, on its face or as expanded by a preliminary recital by the Board or intervenor, that the Board's course cannot be overturned in view of the presumption of validity, the action should be terminated forthwith so that an untrammeled mediation process may take its course. A stronger complaint may permit further inquiry into the range of objective facts—always bearing in mind that the time required for litigation may only delay the period of meaningful mediation.

▮▮▮ In the rare and unusual case where the complaint, as supported by

objective facts, requires overturning the Mediation Board's judgment notwithstanding the vigorous presumption of validity, the court has jurisdiction to require termination of the mediation process. Save for such an extraordinary and exceptional situation the District Court should enter judgment dismissing the complaint with prejudice. It is for the purpose of entering such a judgment of dismissal that the judgment on appeal is reversed, and the case is remanded to the District Court.[15]

So ordered.

15. Our disposition moots the motion of National to strike certain matters in appellee's brief. These matters do not affect the disposition of this appeal.