The **NEW JERSEY COALITION FOR FAIR BROADCASTING**, Petitioner,

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America**, Respondents,

**Educational Broadcasting Corp.**, Intervenor.

No. 78–1082.

United States Court of Appeals, District of Columbia Circuit.

May 1, 1978.

Daniel M. Armstrong, Associate Gen. Counsel, and Sheldon M. Guttmann, Counsel, F. C. C., Washington, D. C., were on the pleadings for respondent F. C. C.

Ellen Shaw Agress, New York City, was on the pleadings for petitioner.

Before WRIGHT, Chief Judge, FAHY, Senior Circuit Judge, and ROBB,* Circuit Judge.

PER CURIAM:

In 1961 a Newark, New Jersey television station, WNTA–TV, assigned its license to a New York City-based educational television station, the predecessor to the current licensee, Educational Broadcasting Company (EBC), which committed itself to providing New Jersey with adequate broadcasting about local public affairs. *NTA Television Broadcasting Corp.,* 44 FCC2d 2563 (1961). Within a decade it became apparent that New Jersey was not receiving adequate public affairs coverage. *See* United Church of Christ, New Jersey in Television: A Case History of Neglect (1971). Accordingly, state officials and organizations formed the New Jersey Coalition for Fair Broadcasting (the Coalition), which filed petitions for FCC rulemaking to restructure New Jersey broadcasting and for the FCC to deny renewal of EBC's license. Ensuing FCC proceedings focused on alternatives to EBC broadcasting and possible improvements in it.[1] The Coalition also filed a petition in May 1975 seeking FCC recovery of monetary penalties—"forfeitures"—from EBC for its violations of programming and other commitments. *See* 47 U.S.C. § 503(b) (1976). The pleading cycle and the FCC investigation of the forfeiture petition were completed within a year, but the FCC went ahead with its other New Jersey-oriented rulemaking and license renewal proceedings without ruling on the forfeiture petition.

Therefore, in January 1978 the Coalition appealed to this court to review the FCC's inaction on the forfeiture petition. The Commission moved for dismissal of the Coalition's appeal, contending that in the rulemaking and license renewal proceedings "the problem of inadequate detailed, local, day-to-day television programming for the residents of New Jersey has received active Commission attention for more than two years."

■■■ We find that Congress did not intend that action on forfeitures should be displaced by other types of FCC proceedings. Congress first established rulemaking and license renewal procedures in the original Communications Act of 1934, 47 U.S.C.

---

* Circuit Judge ROBB did not participate in this decision.

1. *Petition for Inquiry Into the Need for Adequate Television Service for the State of New Jersey,* 58 FCC2d 790, 59 FCC2d 1386, 62 FCC2d 604 (1976) (rulemaking), *aff'd sub nom.* *New Jersey Coalition for Fair Broadcasting v. FCC,* 574 F.2d 1119 (3d Cir. 1978); *In re Educational Broadcasting Corp.,* 61 FCC2d 907 (1976) (license renewal). As of this date the FCC has not resolved EBC's 1975 petition for license renewal. EBC filed in February 1978 for another renewal.

§§ 303 & 307, but various scandals and the rarity of license nonrenewal[2] showed that those procedures were inadequate to enforce broadcasters' duties. Accordingly, in Section 7 of the Communications Act Amendments of 1960, 47 U.S.C. § 503(b), forfeiture procedures were established to penalize monetarily licensees who "willfully or repeatedly" fail to operate stations substantially in accordance with licences or FCC rules.[3] Congress' clear intent in 1960 was to create a new procedure independent and apart from existing ones. Forfeitures were not subject to the three-year cycle of license renewal, and the forfeiture provision declared explicitly that "forfeiture shall be in addition to any other penalty provided by this chapter." As the legislative history noted, "the FCC will not be precluded from ordering a forfeiture merely because another type of sanction or penalty has been *or may be* applied to the licensee or permittee."[4]

■ The policy behind the independent forfeiture provision would be defeated if forfeiture proceedings are delayed pending other FCC activity. Forfeiture was intended to be rapid, with a short (one-year) limitation period, 47 U.S.C. § 503(b)(3), and

provision for licensees to rebut charges only in writing within a "reasonable period" rather than at a hearing, *id.* § 503(b)(2). Penalties were limited to $1,000 per violation up to a total of $10,000 for all violations in a single notice, *id.* § 503(b)(1) & (3), which is low compared to the value of a license so that licensees will generally pay promptly rather than prolong FCC proceedings, seek judicial review, or resist collection. *See Illinois Citizens Committee for Broadcasting v. FCC,* 169 U.S.App.D.C. 166, 515 F.2d 397 (1975) (licensee pays without seeking review); *id.* at 414 n.30 (statement urging rehearing *en banc*). There was a need in 1960 for such a swift, simple, comparatively temperate penalty procedure; today the need is even greater, for the enforceable commitments by licensees to the public are rising in number and importance as the public takes a deeper interest in broadcaster performance.[5] Forfeiture proceedings thus serve as a critical means to enforce the public interest as it is embodied in the rules of the Commission. And because these rules must serve the public interest and must be reconsidered and changed by the Commission when they fail to do so, we see no danger that expeditious forfeiture proceedings will result in penal-

2. H.R.Rep.No.1800, 86th Cong., 2d Sess. (1960), *reprinted in* 1960 U.S.Code Cong. & Admin. News at 3516.

3. It has been suggested that forfeiture proceedings cannot be used to enforce mere "violations of Commission policy." *Agreements Between Broadcast Licensees and the Public,* 35 P & F Rad.Reg.2d 1177, 1189 (1975). Whatever the general status of violations of the Commission's policy, the alleged violations here concern formal commitments about a licensee's fundamental obligations of the type recognized by the FCC as "representations to the Commission," *id.* at 1191, and thus they are within the intent of 47 U.S.C. § 503(b)(1)(A) (1976).

4. H.R.Rep.No.1800, *supra* note 2, at 17, 1960 U.S.Code Cong. & Admin.News at 3525 (emphasis added).

5. *See Agreements Between Broadcast Licensees and the Public, supra* note 3; Schneyer, *An Overview of Public Interest Law Activity in the Communications Field,* 1977 Wis.L.Rev. 619.

To the extent that forfeiture procedures for violations of broadcaster commitments are unreasonably refused or delayed, the public, whose interest is to be served by enforcement of rules, clearly suffers. While this may result in judicial intervention through orders to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1) (1976), *see e. g., Nader v. FCC,* 172 U.S.App.D.C. 1, 25, 520 F.2d 182, 206 (1975) (repeatedly delayed FCC proceeding described by litigant as "an interminable proceeding, the principal function of which has been that of a giant regulatory wastebasket"); *In re Western States Telephone Co.,* D.C. Cir. No. 76–1946, Feb. 7, 1977 (order directing an end to unreasonable delay); *NOW v. FCC,* D.C. Cir. No. 74–1853 (same); *Booth American Co. v. FCC,* D.C. Cir. No. 23,862, Feb. 17, 1970 (same), the public interest is better served where the FCC itself recognizes and fulfills its obligation expeditiously to promulgate and enforce rules in the public interest, rendering judicial intervention unnecessary.

ties for violation of obsolete or unjustified rules.[6]

■ Accordingly, we conclude that there is no basis for deferral or postponement of action on the forfeiture petition in this case. The FCC's motion to dismiss is denied. The record is remanded to the FCC with instructions that the Coalition's forfeiture petition be promptly considered on the merits without further delay.[7]

*So ordered.*

---

6. Indeed, during the hearings on the proposed Communications Act Amendments of 1960, FCC Chairman Frederick W. Ford, in explaining why the proposed legislation provided for standards and sanctions based on rules rather than establishing specific standards for broadcaster conduct in the statute itself, emphasized that rulemaking was preferable to statutory standards because rules could more readily be changed to meet new circumstances:

> I think that is a matter for the discretion of the committee and the Congress. In all instances in which something is good—if you carry it to the logical conclusion, then all the regulations that are good should be in the law.
>
> I think what I am really trying to say is that sometimes a statutory provision freezes a procedure, and it does make it more difficult to change that procedure.

> Sometimes changing circumstances require changes in procedures and it can be done more readily through a change in the rule than it can be through amendatory legislation.

*Hearings on Communications Act Amendments Before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce,* 86th Cong., 2d Sess. 40 (1960) (remarks of FCC Chairman Ford).

7. *See* 5 U.S.C. §§ 555(b) (agency shall conclude matters presented to it "within a reasonable time"), 706(1) (court jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed") (1976); *Environmental Defense Fund, Inc. v. Hardin,* 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970); *International Ass'n of Machinists & Aerospace Wkrs. v. National Mediation Board,* 138 U.S.App.D.C. 96, 425 F.2d 527 (1970).