INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL–CIO, Appellant

v.

NATIONAL MEDIATION
BOARD, et al.

No. 90–5201.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 19, 1991.

Decided April 12, 1991.

As Amended April 29, 1991.

Michael S. Wolly, Washington, D.C., for appellant.

Marc Richman, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., William Kanter, Attorney, Dept. of Justice,

and Ronald M. Etters, General Counsel, Nat. Mediation Bd., were on the brief, Washington, D.C., for Federal appellees. R. Craig Lawrence and Susan A. Nellor, Asst. U.S. Attys., entered appearances, Washington, D.C., for Federal appellees.

Peter Buscemi, with whom William J. Curtin, Harry A. Rissetto and Thomas J. O'Brien were on the brief, Washington, D.C., for appellee Nat. Ry. Labor Conference.

Before: SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Since October 1988, appellant International Association of Machinists & Aerospace Workers ("the IAM") has participated in mediation conducted pursuant to the Railway Labor Act under the auspices of appellee National Mediation Board ("NMB" or "Board"). The Board has sought to settle a nationwide collective bargaining dispute between virtually all of the nation's rail carriers and 12 unions, including the IAM. The IAM has demanded to be released by the Board from further mediation so that it may exercise "self-help" (*i.e.*, strike). The Board has refused to release the IAM, and the IAM therefore filed suit in district court to enjoin the Board from holding it in mediation. The district court granted the Board's motion to dismiss. We affirm.

## I.

### A.

We have recently described in some detail the elaborate framework established by the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, for resolution of labor disputes between unions and rail carriers, *see Local 808, Building Maintenance, Serv. and R.R. Workers v. NMB*, 888 F.2d 1428, 1431–33 (D.C.Cir.1989); *see also Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378–80, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969),

and will summarize it only briefly. "The major purpose of Congress in passing the Railway Labor Act was to provide the machinery to prevent strikes and the resulting interruptions of interstate commerce." *International Ass'n of Machinists & Aerospace Workers v. NMB*, 425 F.2d 527, 533 (D.C.Cir.1970) ("*IAM*"). Toward that end, "[t]he Act provides a detailed framework to facilitate the *voluntary* settlement of major disputes," *Trainmen*, 394 U.S. at 378, 89 S.Ct. at 1115 (emphasis added), relying heavily upon "the traditional instruments of mediation, conciliation, and arbitration," *General Comm. of Adjustment v. Missouri–Kan.–Tex. R.R.*, 320 U.S. 323, 332, 64 S.Ct. 146, 150, 88 L.Ed. 76 (1943), and during whose pendency the union may not strike and no party may alter the status quo, 45 U.S.C. §§ 152, Seventh, 155, First, 156.

A party seeking changes in pay, rules, or other working conditions must first give the other party 30 days written notice of its proposals, during which time the parties must confer on the matters raised. 45 U.S.C. § 156. Should the parties be unable to resolve the dispute through conference, either or both may invoke the services of the National Mediation Board. 45 U.S.C. § 155, First. The Board is obligated promptly to "put itself in communication with the parties" and to "use its best efforts, by mediation, to bring them to agreement." *Id.* The Act specifies no time limit on mediation. If, however, "such efforts to bring about an amicable settlement through mediation shall be unsuccessful," *id.*, the Board "shall at once endeavor as its final required action ... to induce the parties to submit their controversy to [binding] arbitration," which can take place, however, only if both consent. 45 U.S.C. § 155, First. If arbitration is refused by one or both parties, the Board "shall at once notify both parties in writing that its mediatory efforts have failed...." *Id.* The Board may then notify the President that the dispute "threaten[s] substantially to interrupt interstate commerce," and the President may create an emergency board to investigate further and report its recom-

mendations to the President within 30 days, 45 U.S.C. § 160.

Should the Mediation Board not so notify the President, or should the President decline to create an emergency board, the parties are free to resort to self-help. But the parties may do so only after a 30–day "cooling-off" period following the refusal to agree to arbitration. 45 U.S.C. § 155, First. And if an emergency board is created, the parties may not resort to self-help for 30 days following submission of the emergency board's report. 45 U.S.C. § 160.

It is therefore evident that the "crucial aspect of the Act['s ability to forestall strikes is] the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process." *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 149, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969). And the real "key" is the Board's authority to hold the parties to a dispute in mediation so they cannot engage in self-help; it is "a coercive tool essential to bringing the parties to conciliation." *Local 808,* 888 F.2d at 1432, 1438.

### B.

The appellant and 11 other unions set the Act's process in motion by filing notices with virtually all of the nation's rail carriers, requesting changes in wages, rules, and other working conditions. In October 1988, after 10 months of negotiations had failed to resolve the dispute, both sides requested mediation by the Board. When, after one year of mediation, the deadlock remained, all parties insisted that mediation could not break the impasse and requested that the NMB release them and proffer arbitration. The Board instead be-

gan intensified mediation, with NMB Chairman Joshua Javits directly participating, but no headway was made in four months. The IAM alleges that Chairman Javits at this point told its vice-president that "mediation had failed."

The IAM then renewed its request that the NMB release it from mediation and either proffer arbitration or notify the President so he could consider the need for an emergency board. The other 11 unions and all the railroads thereupon reached a "procedural settlement" in which the NMB concurred. Under the settlement's terms, the Board would release the parties from mediation and proffer arbitration and the President would appoint an emergency board on the conditions that: (1) the emergency board would not be bound to report within the 30–day statutory period but would instead have at least 6 months; (2) the parties would refrain from self-help until 30 days after the report issued and only at such time as Congress was in session; and (3) the Board would conduct further mediation on certain aspects of the dispute. The Board offered the IAM the opportunity to participate and informed it that it would be held in mediation unless it accepted.

The IAM alone refused to join the settlement and sought an injunction from the district court restraining the Board from holding it in mediation. The union contended that the Board has no authority to impose conditions governing when it will release parties from mediation and that it was in any event required under the Act to release the IAM because of Javits' "admission" that mediation had been unsuccessful. The district judge, ruling orally from the bench, granted the Board's motion to dismiss.[1]

---

1. The court stated cryptically that "if the Court of Appeals wants to know the basis for my ruling, they can read the transcript. See if they can figure it out." The district court considered affidavits in making this ruling; we therefore review its decision as if it granted summary judgment in favor of the Board. *See* Fed.R. Civ.P. 12(b); *Sacks v. Reynolds Securities, Inc.,* 593 F.2d 1234, 1239 (D.C.Cir.1978). But the propriety of summary judgment turns here on a question of law. The IAM argues that the district court's ruling was erroneous not because there are disputed issues of fact but because the district court incorrectly in its view determined that the facts it alleged did not, as a matter of law, justify setting aside the Board's decision to hold it in mediation. We therefore think it unnecessary to read the transcript.

## II.

The IAM is swimming up river. The scope of review of Board decisions—including determining whether the NMB acted outside of its authority in refusing to release a party from mediation—"is one of the narrowest known to the law," *International Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*, 839 F.2d 809, 811 (D.C.Cir.), *amended*, 848 F.2d 232 (D.C.Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); as we recently observed, the only court to have ordered the Board to terminate mediation was quickly reversed on appeal. *See Local 808*, 888 F.2d at 1433. Close judicial review of the NMB's subtle, yet necessarily freewheeling, methods could cripple the agency because "[t]he effectiveness of [its] private dispute resolution procedures depends ... on the ... assurance that neither party will be able to enlist the courts to further its own partisan ends." *Trans World Airlines v. Independent Fed'n of Flight Attendants*, 489 U.S. 426, 441, 109 S.Ct. 1225, 1234, 103 L.Ed.2d 456 (1989); *see also Local 808*, 888 F.2d at 1433–34. That is why we have said that we will interfere with the Board's efforts only upon a showing of "patent official bad faith," and will order the parties released from mediation only when " 'the Board continues mediation on a basis that is completely and patently arbitrary and for a period that is completely and patently unreasonable.' " *Local 808*, 888 F.2d at 1434 (quoting *IAM*, 425 F.2d at 537).

Appellant asserts that in this case the Board has crossed this high threshold and has acted in patent bad faith. It rests this claim first on the Board's imposition of a barrier to the union's ability to strike not specifically mentioned in the statute—proposing to release it from mediation only if it agreed, along with the other unions, to the procedural settlement—and second on the Board's refusal to release it from mediation even though the Board's Chairman admitted that mediation had "failed."

Appellant makes a great deal of the unorthodox nature of the procedural agreement, even suggesting that it was somehow improper for the NMB to have consulted with the White House concerning the circumstances under which the President would set up an emergency board. We might be able to conceive of procedures or conditions that the Board could seek to impose on parties that would be outside the Board's authority, but this mixed adjudicatory-mediation scheme is not one of them. Jury-rigged it may be, but we are not entitled to prevent the Board from experimenting with any mediation device that can fairly be said to be designed to settle a dispute without a strike and does not independently offend other laws. Indeed, the statute nowhere defines mediation. *See generally Switchmen's Union of North America v. NMB*, 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61 (1943) (definition of terms as used in the Railway Labor Act falls within the NMB's discretion); *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1989).

It thus seems quite apparent that the crux of appellant's case turns on its second proposition—that the NMB was obliged to release the IAM when Chairman Javits said that mediation failed.[2] The government points out that Chairman Javits' remark is not necessarily attributed to the full Board. Even if it were, however, we do not think that it is a hook strong enough to hold appellant's case. To be sure, the statute states that if mediation efforts "shall be unsuccessful," the Board "shall" proffer arbitration. 45 U.S.C. § 155, First. But we do not believe that any great legal significance can be placed on the Chairman's observation that mediation "had failed." It could be said at any stage in a mediation process prior to a successful conclusion of a collective bargaining agreement that mediation up to that point had failed. Congress surely expected the Board to make a judgment as to

---

**2.** Counsel for appellant conceded at oral argument that the legal effect of the statement would be decisive.

whether mediation would be unsuccessful in the future before it gave up.[3] We cannot conclude, based on Chairman Javits' statement, that this was a case in which there was manifest "a lack of any genuine hope or expectation that the parties will arrive at an agreement." *Local 808*, 888 F.2d at 1434 (quoting *IAM*, 425 F.2d at 537). In this case, as the government points out, the IAM's implacability might well soften, if after this hybrid procedure runs its course, a settlement between the railroads and the other 11 unions comes about. It is well recognized that the Board is entitled to use time alone to wear down an obdurate bargainer. *See Brotherhood of Ry. & S.S. Clerks v. Florida East Coast Ry.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966); *see also Local 808*, 888 F.2d at 1432, 1436–38; *International Bhd. of Elec. Workers v. Washington Terminal Co.*, 473 F.2d 1156, 1171 (D.C.Cir. 1972), *cert. denied*, 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973).

Accordingly, although it is possible to construe the Chairman's remark as meaning that he is giving up on mediation, we do not think it appropriate for a court to examine a Board member's statements, made in the course of mediation, so critically. Successful mediators often liberally use blarney (hoomalimali in Hawaiian) as one of their mediation tools. *See Local 808*, 888 F.2d at 1436–37. The Chairman's statement may well have been a ploy. By inquiring as to the true meaning of such a statement we could well undermine its entire purpose by forcing the Board to admit it was a tactic to spur negotiations. Thus, intrusive judicial scrutiny would likely prolong the dispute—litigation hardens the parties' positions and " 'the artificial pressure and distortion' " of an appeal to the courts further detracts from the mediatory effort. *Id.* at 1439 (quoting *IAM*, 425 F.2d

at 540). For that reason, we think it inappropriate ordinarily to review statements by individual members of the Board made in the course of dealing with the parties to determine whether the Board concluded or should have concluded that mediation will not be effective. Congress, presumably with these considerations in mind, required the Board to notify the parties *"in writing* that its mediatory efforts have failed" after its proffer of arbitration is refused, 45 U.S.C. § 155, First (emphasis added); it is at that point that Congress expected legal significance to attach to Board communications with the parties concerning failure of mediation (the parties may engage in self-help 30 days after receiving the written notification).

\*   \*   \*   \*   \*   \*

For the foregoing reasons, the district court's dismissal is affirmed.

*It is so ordered.*

---

**3.** Moreover, we cannot see how we could find patent official bad faith solely on the basis of a statement by the Board that mediation could not in the future work. Whether mediation will eventually work is truly unknowable—one of the chief attributes of mediation is that the passage of time alone will produce an atmosphere more conducive to settlement. *See, e.g., Local 808*, 888 F.2d at 1436–38. It is thus no

surprise that our review in this area has focused not on whether mediation could work but on the amount of time the Board has held a union in mediation and that we have suggested that we will order the Board to end mediation only after a theoretical time limit ("a period that is completely and patently unreasonable") has passed with no resolution. *See, e.g., Local 808*, 888 F.2d at 1434; *IAM*, 425 F.2d at 543.