INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL–CIO (IAM), and IAM District Lodge 143, Plaintiffs,

v.

NORTHWEST AIRLINES, INC., Defendant.

No. Civ. 4–87–1006.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 25, 1987.

Joseph Guerrieri, Jr., John A. Edmond, Guerrieri, Edmond & James, Washington, D.C., and Richard A. Williams, Jr., Michael W. Unger and John Edmund Daly, Hvass, Weisman & King, Minneapolis, Minn., for plaintiffs.

John J. Gallagher, Paul B. Hewitt and Margaret H. Spurlin, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., and David A. Ranheim and John Scanlon, III, Dorsey & Whitney, Minneapolis, Minn., for defendant.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

This matter comes before the court on a motion by the plaintiffs International Association of Machinists and Aerospace Workers, AFL–CIO, and IAM District Lodge 143, (IAM) for a temporary restraining order against the defendant Northwest Airlines, Inc. (Northwest). Jurisdiction is alleged under 28 U.S.C. § 1337; the action arises under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* The IAM seeks to restrain Northwest from unilaterally insti-

tuting changes in wages, benefits, and working conditions. Northwest claims it is entitled to engage in self-help since negotiations have reached impasse.

*Background*

The underlying facts are not well developed at this stage of the litigation, but the background may be drawn from the parties' submissions and their statements at the hearing.

IAM is an international labor organization which represents over 800,000 members in the United States and Canada. It currently represents a number of Northwest mechanics, office and clerical employees, and fleet passenger service employees.

Northwest is an air carrier as defined in the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, (the Act). On August 12, 1986, Republic Airlines Inc. (Republic) was merged into Northwest to create a single carrier.

As of the date of the merger, Northwest became party to four separate collective bargaining agreements which are material to this suit:

1) The former Republic mechanics and related craft employees (mechanics) are represented by the IAM under an agreement known as the "White Book." [1]

2) Employees who were Northwest mechanics before the merger are also represented by the IAM, and their collective bargaining agreement is known as the "Brown Book."

3) The clerical, office, and fleet passenger service employees (COFPS) employed by Northwest before the merger were represented by the Brotherhood of Airline and Railway Clerks (BRAC) under an agreement known as the "Green Book."

4) The Republic COFPS employees were represented by the Airline Employees Association (ALEA) under an agreement known as the "Orange Book."

After the merger, the National Mediation Board (NMB) realigned some of the employee classifications and held elections among all the COFPS employees. The IAM won this election and was certified on May 14, 1987 to represent the COFPS personnel; the pre-existing collective bargaining agreements remain in place however, until they expire or are renegotiated. Thus, the IAM currently represents two classes of employees—mechanics and COFPS personnel; under four separate agreements—the White, Brown, Green and Orange Books.

After the IAM became the representative of all mechanics, it engaged in negotiations with Northwest on a transition agreement with the idea of merging the White and Brown agreements into one. These negotiations, which have taken place intermittently since mid–1986, have been unsuccessful. A similar effort to merge the COFPS employees' agreements has been ongoing since May 14, 1987 when the IAM was certified as bargaining agent for that group. These negotiations for a transitional agreement for COFPS employees have also been unsuccessful.

The parties vigorously differ in their interpretation of the bargaining history between the IAM and Northwest. The IAM asserts that all negotiations to date have been negotiations over a transitional agreement, and not over the terms of any existing agreement. Northwest, in contrast, argues that because the White Book is the only agreement "open" for renegotiation under the Act,[2] the negotiations that have

---

1. Northwest voluntarily recognized the IAM as the representative of the former Republic mechanics as of the date of the merger, although the National Mediation Board had held that union certifications of Republic were extinguished by the merger. *Northwest Airlines, Inc.,* 13 NMB 399 (1986).

2. An agreement is "open" for mandatory negotiation generally only by either side proposing negotiations during a "window period," usually sixty days before the agreement's expiration

date. The expiration dates of the agreements are as follows:

*White Book:* July 31, 1986
*Brown Book:* April 30, 1988
*Orange Book:* April 30, 1986 (The agreement was automatically renewed through December 31, 1987. Both sides have recently opened this contract for negotiations, however that opener is not material to this dispute for a temporary restraining order.)
*Green Book:* December 31, 1988.

occurred have been White Book negotiations. Although the White Book's expiration date passed on September 30, 1986, neither party denies that its terms continued in effect for all former Republic employees under the Act's status quo provisions, until unilaterally modified by Northwest on November 22, 1987.

Northwest claims that it reopened White Book negotiations on May 27, 1987, by delivering a complete package proposal to the IAM. Negotiations were held for several days in May and June of 1987, with Northwest apparently asserting that the White Book was the only mandatory subject of bargaining, although it was willing to entertain proposals on other non-mandatory topics such as the transition agreement. The IAM insists that any negotiations were for a transitional agreement only, covering the terms and conditions of all four collective bargaining agreements. According to the IAM, White Book negotiations have not taken place.

On June 15, 1987, the parties agreed that they were at impasse in their negotiations. Northwest subsequently filed with the NMB for mediation, limited to the White Book. The IAM refused to participate in any mediation concerning the White Book on the grounds that the parties had not had discussions on the White Book so mediation was premature. Northwest thereafter withdrew its application for mediation.

Direct negotiations began anew on October 27, 1987, and Northwest submitted a White Book proposal. On November 4, 1987, negotiations broke down, and Northwest declared they were at impasse. On November 10, 1987, the IAM sent form NMB–2 and an accompanying letter to the NMB invoking mediation. Plaintiff's Exhibit F. In its submission to the NMB, the IAM maintained its position that no White Book negotiations had taken place, and insisted that the parties' discussions concerned a transition agreement. The IAM stated at the hearing that it filed this re-

quest "out of an abundance of caution" due to the declaration by Northwest of an impasse on the White Book. It believes its request invoked mediation over all facets of the negotiations, including the terms and conditions of employment in the White Book.

On November 10, 1987, the NMB docketed the matter (NMB Case No. A–11961) and issued a letter acknowledging the application, and noted: "The parties are reminded of the status-quo provisions of the Railway Labor Act." Letter of Charles R. Barnes, Nov. 10, 1987. Plaintiffs' Exhibit G. The National Mediation Board issued a follow-up letter, at the request of the IAM, stating that while it was not in a position to assess the legal obligations that apply to the case, the mediation request which it docketed under No. A 11961 at least potentially encompasses the rates of pay, rules, and working conditions of the White Book, Orange Book, and Brown Book. The letter adds that the statement is not intended to alter the legal rights or obligations of either party. Letter of Charles R. Barnes. Nov. 19, 1987. Plaintiffs' Exhibit I.

Northwest claims that the IAM's request did not specifically invoke mediation on the White Book, and Northwest is therefore not bound by the status quo provisions of the Act. Accordingly, on November 22, 1987, Northwest engaged in self-help and unilaterally imposed changes in wages, benefits, and working conditions for all employees governed by the White Book. The IAM alleges that this unilateral change while mediation is pending violates the Act and causes the Union great harm. It urges that the unilateral changes be temporarily restrained until the court can consider a request for a temporary injunction.[3]

The IAM filed this action and complaint and its motion for a temporary restraining order on Friday, November 20, 1987. A hearing on the motion was scheduled for the next business day, Monday, November

---

**3.** The IAM suggests in its written submissions that one ground for seeking the restraining order was that Northwest never formally opened White Book negotiations, a prerequisite to declaring impasse and engaging in self-help under

the RLA. That theory has apparently been abandoned, however. It is inconsistent with the IAM assertion that it requested mediation on November 10, 1987 on the White Book.

23. In the meantime, Northwest implemented the unilateral changes as of 12:01 a.m. Sunday, November 22, 1987, as planned. The changes relate to both compensation and benefits. The wage changes have apparently been programmed into a computerized payroll; the first checks under the new wage scale would be issued in mid-December. The computerized program can be readily changed to issue the payroll under either the prior or the revised wage scale. Northwest has indicated that the changes in benefits will have no practical effect for several months until time for the funds' annual renewal. The most immediate result of Northwest's self-help has apparently been revised work rules.

*The Railway Labor Act*

 The Act, 45 U.S.C. § 151 *et seq.*, was created with the primary purpose of providing for efficient resolution of labor disputes and avoiding as much as possible any interruption to interstate commerce. The statute imposes an elaborate framework for peaceful resolution of disputes, including mediation by the NMB. A fundamental precept of the Act is that until every other avenue for resolution of a dispute has been unsuccessful, both sides are held to the status quo and may not engage in self-help or other economic action. The Eighth Circuit recently summarized what it terms the Act's " 'almost interminable' procedures which must be followed in settling disputes":

> Any party seeking to make changes in rates of pay, rules or working conditions of employees must file a notice pursuant to section 6 of the RLA, 45 U.S.C. § 156, and confer with the other party. 42 U.S.C. § 152, Seventh. If the parties are unable to resolve their dispute, they may invoke the services of the NMB or the

Board may, in an emergency situation, proffer its services. 45 U.S.C. § 155, First. If the NMB is unsuccessful in helping to resolve the dispute, the Board must attempt to induce the parties to agree to arbitration. Said arbitration is not, however, mandatory. *Id.* If the dispute is not resolved under these provisions of the Act and the NMB finds the dispute should threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," the NMB must contact the President of the United States who may set up an Emergency Board to evaluate the dispute and report to him. 45 U.S.C. § 160. Throughout this period, the parties may not alter the status quo and no changes may be made in those rates of pay, working conditions or rules which are the subject of the dispute. It is only after all statutory procedures have been exhausted that the parties may engage in self help.

*Trans World Airlines v. Independent Federation of Flight Attendants,* 809 F.2d 483, 486 (8th Cir.1987).

 The IAM claims that a temporary restraining order is warranted because Northwest violated section 6 of the Act, which prohibits unilateral changes in rates of pay, rules, or working conditions if mediation is requested within ten days of the declaration of impasse.[4] IAM argues it requested mediation on November 10, 1987, less than ten days after Northwest declared impasse on November 4, 1987.[5] IAM claims that Northwest therefore violated the mandatory provisions of the Act and disrupted the status quo in a matter constituting a major dispute,[6] and that it is

---

4. Section 6 provides in relevant part:
In every case where ... the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C. § 156.

5. Both sides appear to agree that if the IAM's November 10, 1987 filing with the NMB constituted a valid invocation of mediation, it was timely under the Act.

6. A "major dispute" is one which involves proposals to alter rates of pay, rules, or working conditions, *see Elgin Joliet & Eastern Ry v. Burley,* 325 U.S. 711, 722–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1975).

entitled to a temporary restraining order to maintain the status quo. *Chicago & Northwestern Ry. v. UTU,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).[7]

### Dataphase Factors

■ The standard test for a temporary restraining order in this circuit requires consideration of: (1) the threat of irreparable harm to the movant; (2) the balance of this harm and any injury that the temporary relief would inflict on other parties; (3) the probability of success on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981).[8]

### 1. Threat of Irreparable Harm

IAM claims that its ability to represent Northwest employees is undermined if the company can unilaterally change the collective bargaining agreement. Such an action, claims the IAM, would work an unfair advantage in favor of the employer and would suggest that the union cannot adequately represent its members' interests. Furthermore, the changes would undermine the IAM's status as exclusive bargaining representative and would force concessions without exhausting the mandatory procedures of the Act.

Northwest responds that no injury at all results from its revisions of the existing agreement since compensation of employees is increased. The IAM claims that other benefits of these employees have been cut significantly, however. Moreover, the Act implicitly acknowledges that the adversarial process is the best guarantor that each side's interests will be adequately represented in labor negotiations. It is undeniably the IAM's role to represent Northwest employees, and that role is undermined if Northwest is permitted unilaterally to change the collective bargaining agreement without first fully complying with the mediation provisions of the Act. Thus, since it appears that mediation was properly invoked, the IAM faces irreparable harm if the unilateral changes are not restrained.

### 2. Balance of Harms

The court recognizes that each side has an unspoken interest here, and that is to gain any advantage possible in their ongoing labor disputes. This reality is not a factor for the court to weigh when comparing equities, however. In a more perfect world the parties would be able to devote their time and energies to a cooperative effort to improve the carrier's position in the competitive marketplace. The case is

---

7. Northwest argues that a temporary restraining order is unavailable to the IAM because the Norris LaGuardia Act, 29 U.S.C. § 108, prohibits injunctive relief to a party with unclean hands. Northwest alleges that the IAM has refused to bargain in good faith, has insisted on negotiating non-mandatory topics, and has committed unlawful acts of slowdown, intimidation and vandalism.

Norris LaGuardia does not necessarily prohibit injunctive relief to enforce the status quo provisions of the Act where the Act's settlement procedures have not been exhausted. *See Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern Railroad Company,* 802 F.2d 1016, 1021 (8th Cir.1986). Rather, "the proper role of the courts is to ensure that the 'obvious purposes' of both the RLA and the Norris–LaGuardia Act is preserved." *Airline Pilots Ass'n v. United Air Lines, Inc.,* 802 F.2d 886, 901 (7th Cir.1986) *citing Brotherhood of Railroad Trainmen v. Chicago Rivers and Indiana Railroad,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Courts must therefore weigh the competing equities to determine whether prohibiting injunctive relief would further the purposes of both statutes. *Id.* at 901. Here it appears the status quo requirement fundamental to the Act would be subverted if relief were not granted.

Northwest's allegations of unclean hands and violations of the duty to bargain are only conclusory in nature at this point.

8. The IAM asserts that with a major dispute such as this unilateral change in wages, benefits, and working conditions, an injunction may issue without regard to the usual balancing of equities. *United Transportation Union v. Burlington Northern Inc.,* 458 F.2d 354, 357 (8th Cir.1972). The *Dataphase* balancing of equities, however, provides an appropriate framework for assessing the propriety of relief here, particularly at this early stage where the facts are not well enough developed to determine conclusively if a violation of section 6 has occurred, or the full significance of Northwest's unilateral revisions.

in court, however, and the motion for relief must be addressed.

The IAM asserts that Northwest cannot be harmed by maintaining the status quo since that would merely require it to abide by the Act. Northwest, on the other hand, argues that unless its changes are implemented, it will be "hamstrung" in conducting efficient airline maintenance. It urges that separate work rules for employees working side-by-side is wasteful and delays the synergies anticipated by the merger with Republic.

Any harm to Northwest by delaying implementation of its changes would not outweigh the potential harm from permitting it to avoid the "almost interminable" procedures imposed by RLA for resolving disputes short of self-help. *See Trans World Airlines v. Independent Federal of Flight Attendants*, 809 F.2d at 486. Even when, as here, the negotiating process has been largely unsuccessful, the collective bargaining agreement, which represents years of struggle and negotiation, should still govern the relationship between the parties until all formal avenues of resolving the dispute are exhausted. *See Brotherhood of Railway & Steamship Clerks, Freight Handler, Express and Station, AFL–CIO v. Florida East Coast Ry. Co.*, 384 U.S. 238, 246–47, 86 S.Ct. 1420, 1424–25, 16 L.Ed.2d 501 (1966).

The threat of immediate harm to Northwest, if its unilateral changes are restrained, is minimal. Northwest asserts that the wages and benefits it imposed increase its costs.[9] If this is so, Northwest faces no pecuniary loss by being held to its White Book agreement, but instead actually saves money by maintaining the status quo prior to November 22, 1987. Thus, its only acknowledged harm would be the continued inefficiencies of maintaining different labor agreements for employees performing simlar jobs.

In contrast, the potential harm to the IAM, if Northwest is not restrained, is more grave. If Northwest is allowed unilaterally to impose new wages, benefits and work rules, the IAM's status as sole representative and proponent of the employees' interests is undermined.

The balance of harms therefore favors granting a temporary restraining order to avoid subversion of the IAM's statutory role as bargaining agent for the employees and the Act's aversion to self-help except as a last resort.

### 3. *Probability of Success*

The parties have a fundamental disagreement on the merits. The IAM claims that Northwest can provide no authority permitting unilateral changes while the matter has been submitted to mediation and that its changes violate the Act. Northwest does not contest that self-help is improper once a matter has been submitted to mediation. Rather, it argues that mediation on the White Book was never requested by the IAM. Northwest is adamant that the White Book is the only agreement open for mandatory renegotiation, and thus the only agreement which could possibly be the subject of impasse. Northwest's notification of impasse to the NMB was therefore necessarily limited to the White Book. Northwest claims that because the IAM failed to specify that it was seeking mediation for the White Book, the airline is entitled to self help.

Examination of documents connected to the NMB is useful. It is true that the IAM continued to state the issue in terms of transition agreement negotiations when it filed for mediation. Its submission on form NMB–2 did not specifically mention mediation of the White Book. This submission did, however, incorporate the November 10, 1987 letter by William W. Winpisinger, International President of IAM,

---

**9.** Northwest stated at the hearing that it would not attempt to recoup overpayments to employees should the increased wages and benefits later be rescinded.

The IAM disputes that Northwest's revised wage and benefit plan increases the airline's costs. It states that the overall result is a twenty to thirty percent decrease in Northwest's expenditures for wages and benefits even though some wages would increase.

By the time of the preliminary injunction hearing the record may be more developed on such issues as the respective costs and benefits of the changes to the parties.

which requested that the NMB advise Northwest that by claiming impasse on White Book negotiations, it violated the Board's decisions. The NMB responded by docketing the request for mediation, and noting that the dispute "at least potentially encompasses the rates of pay, rules, and working conditions provided in [the White Book, Orange Book, and Brown Book]."

From the record at this stage, it seems that the IAM has set the mediation machinery in motion and that the NMB may well mediate the White Book dispute. The IAM thus has prospects for success on the merits. At the very least, the IAM has raised difficult questions calling "for more deliberate investigation," *Dataphase*, 640 F.2d at 113, and the equities are such that the court should intervene to preserve the status quo until the merits are determined. *Id.*

### 4. *The Public Interest*

Northwest urges that the public interest is served by permitting the implementation of its changes, thus providing a uniform set of rules and a more efficient work force.

A more immediate public interest is also implicated, however. Once mediation is abandoned and self-help allowed, both sides to the dispute are released from the pre-existing agreement and permitted to take economic action. This includes not only implementation of a benefit and work rule package designed by the employer alone, but also the possibility of a strike by the employees. The entire Act is designed to avoid this potentially disruptive result except as a last resort after all other attempts for resolution have failed.

Here the public interest is best served by maintaining the status quo and restraining self-help, at least until a preliminary injunction hearing can be held or the NMB declares that mediation on the White Book was not invoked.

Based on the considerations already discussed, the balance of equities favors temporary relief preventing any further unilateral changes by Northwest and returning the parties to the status quo prior to November 22, 1987. Neither party has ad-

dressed the issue of a bond, but it appears that a bond in the amount of $20,000 would be reasonable under all the circumstances.

### ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. The motion for a temporary restraining order of the plaintiffs International Association of Machinists and Aerospace Workers, AFL–CIO, (IAM) and IAM District Lodge 143 is granted, and defendant Northwest Airlines Inc. is temporarily restrained from unilaterally changing or modifying the rates of pay, rules and working conditions of its employees represented by the IAM, and all unilateral changes imposed by Northwest on or after November 22, 1987 shall be withdrawn.

2. This order shall be effective upon the plaintiffs' filing a bond in the amount of $20,000.

3. A preliminary injunction hearing will be held at 10:00am on Friday, December 4, 1987 unless the parties and the court agree to a later date.

4. This order will remain in effect until 6:00 p.m. on December 9, 1987 or further order of the court.