INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL–CIO (IAM), and IAM District Lodge 143, Plaintiffs,

v.

NORTHWEST AIRLINES, INC. Defendant.

No. Civ. 4–87–1006.

United States District Court, D. Minnesota, Fourth Division.

Dec. 10, 1987.

Joseph Guerrieri, Jr., Guerrieri, Edmond & James, Washington, D.C., appeared on behalf of plaintiffs.

John J. Gallagher, Esq., and Paul B. Hewitt, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., and Robert Hobbins, Dorsey & Whitney, Minneapolis, Minn., appeared on behalf of defendant.

## MEMORANDUM OPINION and ORDER

DIANA E. MURPHY, District Judge.

Before the court is a motion by the plaintiffs International Association of Machinists and Aerospace Workers, AFL–CIO, and IAM District Lodge 143, (IAM) for a preliminary injunction against the defendant Northwest Airlines, Inc. (Northwest). Jurisdiction is alleged under 28 U.S.C. § 1337; the action arises under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (RLA). The IAM seeks to restrain Northwest from unilaterally instituting changes in wages, benefits, and working conditions. Northwest claims it is entitled to engage in self-help since negotiations have reached impasse.

On November 24, 1987, the court issued a temporary restraining order against Northwest, restraining implementation of these unilateral changes. Memorandum Opinion and Order, 674 F.Supp. 1387 (D.Minn.1987). Both sides have since submitted further memoranda and supporting materials.

An evidentiary hearing was held on December 4, 1987. The parties stipulated to the introduction of the affidavits and accompanying exhibits of Guy Cook, president and general chairman of IAM, District Lodge 143, and Michael Fahey, staff vice president of labor relations at Northwest.

They are the principal negotiators for each side. Both also gave direct testimony and were cross examined.

Two other Northwest affiants, Ken Lawson, a manager of base maintenance, and Douglas Walker, a mechanics' foreman, submitted affidavits in lieu of direct testimony and were cross examined. A hearsay objection was reserved by the IAM for portions of Mr. Lawson's testimony.[1] The verified complaint was also received by stipulation. After testimony, oral arguments were made and the court took plaintiffs' motion under advisement.

## I.

Much of the background is stated in the court's previous Memorandum Opinion and Order and will not be repeated; rather, that discussion is incorporated here. Additional facts have also been developed by the testimony and new submissions.

Labor relations at Northwest became more complicated after the merger with Republic on August 12, 1986. The parties met more than a dozen times after the fall of 1986 to discuss a transition agreement. Then, in May 1987, the National Mediation Board (NMB) issued new class certifications and pronounced the IAM the sole representative of all clerical, office, and fleet passenger service personnel, (COFPS). The IAM already represented all mechanics and related craft employees (mechanics). Negotiations began again and Northwest proposals through June of 1987 included proposed changes in the Orange, Brown, and White Books.[2] It appears that both sides desired to negotiate a transition agreement. From May 1987 to date, Northwest has taken the position that the White Book is the only mandatory topic of negotiation. Modifications of other "Books" were also discussed, however.

A major impediment to reaching a transition agreement was disagreement over part-time employment for station agents. Part-time employees were permitted by Republic, but the IAM wants to prohibit them at Northwest.

In late June 1987 Northwest declared impasse. It then applied to the NMB for mediation. The mediation was docketed and both sides maintained the status quo. On October 23, 1987, Northwest withdrew its request for mediation, and the parties were released by the NMB.

A negotiating meeting took place on October 27, 1987, where Northwest for the first time made a proposal limited almost solely to the White Book.[3] That meeting lasted only about one-half hour, however, and was adjourned in disharmony when the IAM recognized that Northwest was offering terms substantially identical to the Brown Book as its White Book proposal. *See* Defendant's Exhibit 47. A second meeting was held November 4, 1987, where no progress was made. Northwest then declared impasse. The IAM applied to the NMB for mediation on November 10, 1987, in an attempt to preserve the status quo, and in what it terms, "an abundance of caution."

Northwest refused to recognize the validity of the IAM's application for mediation, and announced a unilateral revision of the terms and conditions of employment for

1. Other affidavits and exhibits, including portions of defendant's exhibits 38, 39 and 40, were submitted in advance although these witnesses were not available to testify. The documents were not formally offered at the hearing, but the court has read and considered them, noting the hearsay nature of some of the statements and the lack of cross examination. The pilot reports in Exhibit 40, for example, were edited excerpts and may reflect their own interests. Nevertheless, the exhibits are received into the record.

2. Northwest established at the hearing that the Brown Book and Green Book each have dura-

tion clauses that have not expired (Brown Book Duration Date May 1, 1988) (Green Book Duration Date January 1, 1989). Both also have no-strike clauses which prohibit sympathy strikes.

The Orange Book similarly was not open for negotiations in the summer of 1987, but has since been opened. No negotiations have yet taken place on the Orange Book exclusively.

3. The proposal did include provisions for 30 Orange Book employees, but this was made to accommodate a realignment of class and craft by the NMB wherein 30 maintenance workers were added to the mechanics class.

the White Book employees. That plan to impose unilateral changes is the subject of this motion for a preliminary injunction.

## II.

The IAM asserts that the court ruled correctly on its earlier motion and that it is entitled to a preliminary injunction for the reasons already recognized by the court. It argues that it timely invoked mediation under the RLA, and that its request encompassed the White Book. Therefore under the RLA, since mediation is ongoing, neither side may alter the status quo. *International Association of Machinists & Aerospace Workers v. National Mediation Board*, 425 F.2d 527, 529 (D.C.Cir.1970).

Northwest opposed the temporary restraining order by urging that it was entitled to use self-help because it negotiated to impasse on the White Book and the IAM did not thereafter timely apply for mediation under the Act. This argument focused on the language of the IAM's application for mediation which did not specifically request mediation over the White Book. *See* Memorandum Opinion and Order, November 24, 1987, 674 F.Supp. at p. 1389.

Northwest emphasizes now that only proposals on issues which are "open" for negotiation and that are disputed in good faith are properly subject to mediation. Northwest also argues that there is no hope that the NMB will mediate anything until this court resolves whether the application for mediation was sufficient to bring this dispute within the RLA.

The IAM challenges Northwest's assertion that this court must resolve legal disputes before mediation may proceed. It argues that under the statutory framework courts should not interfere in the mediation process once initiated. Mediation continues at the discretion of the NMB until it has run its course.[4]

The IAM asserts that it stands ready to negotiate in any manner the NMB suggests. If the IAM is indeed negotiating in bad faith, (a claim it contests), Northwest will have its remedy by being released by the NMB. Until then, argues the IAM, Northwest is bound by the status quo provisions of the RLA. By unilaterally imposing changes for the White Book employees, Northwest acted prematurely, and its unilateral changes should be enjoined.

Northwest argues that any attempts at mediation through the NMB would be fruitless because the parties disagree about what is the proper subject of mediation. Northwest urges the court therefore to resolve whether mediation was properly invoked. It argues that the NMB will not undertake an adjudicatory role. *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) (statutory obligations under section 2 of RLA enforceable in court after compliance with all provisions of the statute); *International Brotherhood of Teamsters v. Texas International Airlines, Inc.*, 717 F.2d 157 (5th Cir.1983) (NMB lacks authority to enforce labor agreements or the status quo provisions of the RLA or to perform other adjudicatory functions).

The IAM does not argue that the NMB has an adjudicatory role, but it argues that judicial intervention in the mediation process is premature. Once the mediation process has begun, the courts should not interfere. Mediation goes forward at the discretion of the NMB until it has "run its course." *International Association of Machinists v. National Mediation Board*, 425 F.2d at 537. Court intervention in the mediation process is only appropriate if "the Board continues mediation on a basis that is completely and patently arbitrary and for a period of time that is completely and patently unreasonable, notwithstand-

---

4. At oral argument, the IAM summarizes its view of the NMB's procedure: Once a case is docketed, the NMB assigns an investigator who determines if mediation might be fruitful. If so, the NMB will urge the parties to meet, and will use a variety of mediating techniques to bring both sides to agreement. If mediation is unsuccessful, the NMB will proffer arbitration, which either side may reject. If arbitration is not accepted, then the NMB can either require the parties to submit their dispute to a Presidential Review Board, or, after at least 30 days, release the parties to engage in self-help.

If a party feels aggrieved by the other's position, it can either request release from the NMB, or seek a court order to compel bargaining.

ing the lack of any genuine hope or expectation that the parties will arrive at an agreement." *Id.* at 537. According to the IAM, the parties can be relieved of their duty to mediate only by seeking discharge from the NMB, or by completing the requirements of section five of the Act.[5]

■ For the court to intervene now and attempt to construe the mediation application as requested by Northwest would be premature. The NMB has done little more than docket IAM's application.[6] It would be imprudent for the court to presume the NMB's response to the application or the outcome of the proceedings which have been initiated. The issue raised by Northwest is not ripe for adjudication by this court.[7]

The court has before it plaintiffs' motion for a preliminary injunction. The complaint seeks relief from Northwest's violation of the status quo provisions of the RLA by unilaterally altering the wages, rules and working conditions. No declaratory relief is sought regarding the adequacy of the application for mediation. No answer has yet been filed, nor has Northwest made any counterclaim. This litigation is still in its early stages. Adjudication of the merits of the claim for permanent injunctive and declaratory relief, including any possible defenses or counterclaims by Northwest, should occur after the record is more fully developed.

### III.

■ The standard test for a temporary injunction requires consideration of: (1) the threat of irreparable harm to the movant; (2) the balance of this harm and any injury that the temporary relief would inflict on other parties; (3) the probability of success on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981).[8]

---

**5.** Section 5 First, is as follows:

The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:

(a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference.

(b) Any other dispute not referable to the National Railroad Adjustment Board and not adjusted in conference between the parties or where conferences are refused.

The Mediation Board may proffer its services in case any labor emergency is found by it to exist at any time.

In either event the said Board shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to agreement. If such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final required action (except as provided in paragraph third of this section and in section 160 of this title) to induce the parties to submit their controversy to arbitration, in accordance with the provisions of this chapter.

If arbitration at the request of the Board shall be refused by one or both parties, the Board shall at once notify both parties in writing that its mediatory efforts have failed and for thirty days thereafter, unless in the intervening period the parties agree to arbitration, or an emergency board shall be created under section 160 of this title, no change shall

be made in the rates of pay, rules or working conditions, or established practices in effect prior to the time the dispute arose.
45 U.S.C. § 155, First.

**6.** The NMB did write a letter, at the IAM's request, regarding the NMB's understanding of the scope of the dispute. Plaintiffs' Exhibit F. *See Order* November 24, 1987, 674 F.Supp. at 1389.

**7.** Two factors relevant to ripeness are the fitness of the issue for judicial resolution and the hardship to the parties of withholding consideration. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Granville House Inc. v. Dept. of Health and Human Services,* 715 F.2d 1292, 1299 (8th Cir. 1983). The unfitness of the issue for resolution at this time is clear by the parties' speculative and inconsistent portrayals of how the NMB will next proceed. Even under the authority cited by Northwest, resolution of the legal issues it asserts would be premature. In *Flight Engineers' International Association v. American Airlines, Inc.,* 303 F.2d 5 (5th Cir.1962), a case strongly relied on by Northwest, the district court intervened to resolve what issues were "open" for mediation only after the NMB announced that mediation would be delayed pending resolution of the legal controversy. Relative hardship is discussed later in this opinion. *See infra* pp. 1397–99.

**8.** The IAM asserts that with a major dispute such as this unilateral change in wages, benefits, and working conditions, an injunction may issue without regard to the usual balancing of

In its previous opinion the court analyzed the *Dataphase* factors. That analysis is hereby incorporated, but some additional discussion is needed. The record is now more complex due to the further evidence presented and a shift in the parties' legal arguments.

The threat of irreparable harm to the IAM remains the same, that is, subversion of its role as the representative of the employees should self-help be permitted without an attempt at mediation. Although Northwest urges that the proper focus is upon the employees whose benefits would be changed and who cannot be harmed since their compensation would be increased, this is hotly contested by the union.[9] The balance of harms favors the movants. Any harm to Northwest by delaying implementation of its changes is less than the harm to the IAM if its status as exclusive representative is subverted. Northwest has not shown it would suffer specific injury if enjoined temporarily.

At the hearing, the parties' real interests became more apparent. The IAM currently represents employees under four separate agreements, each having no-strike provisions and separate duration clauses. The union's bargaining position and ability to exert economic pressure would be enhanced if all the contracts expired at once. The IAM claims that Northwest is attempting to force a strike before the Brown Book expires on May 1, 1988, at which time all the mechanics could strike. Northwest, on the other hand, argues that the IAM is invoking mediation and intentionally stalling until May 1988, and has no intention of resolving the only mandatory topics of negotiation. Each side understandably wants to be in the strongest posture possible. The record does not show which side would necessarily gain most from mediation, only that mediation is preferred under the statutory framework.

The parties continue their fundamental disagreement on the merits. The IAM argues that Northwest must mediate because self-help and the resulting industrial disharmony and interruptions of commerce are permitted only as a last resort when the statutory procedures are exhausted. *See Detroit and Toledo Shoreline R.R. v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); *Trans World Airlines Inc. v. Independent Federation of Flight Attendants*, 809 F.2d 483 (8th Cir.1987), *cert. granted*, — U.S. —, 107 S.Ct. 3183, 96 L.Ed.2d 671 (1987). Northwest responds that the IAM's mediation application is faulty because it attempts to compel mediation on non-mandatory subjects. Therefore it says the RLA status quo provisions do not apply.

Northwest raises three arguments why it is likely to succeed on the merits. First, the mediation request was improper because the IAM negotiated to impasse and sought mediation on a non-mandatory topic which is an unfair labor practice under the RLA. *Air Line Pilots Association, International, v. United Air Line, Inc.*, 802 F.2d 886, 903 (7th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987) (applied NLRA mandatory/non-mandatory distinction to RLA). Second, the IAM's request for mediation impermissibly ties negotiations on a mandatory subject to non-mandatory subjects,

equities. *United Transportation Union v. Burlington Northern Inc.*, 458 F.2d 354, 357 (8th Cir.1972). The *Dataphase* balancing of equities, however, provides an appropriate framework for assessing the propriety of relief here, particularly at this stage where the facts are not well enough developed to determine conclusively if a violation of section 6 has occurred, or the full significance of Northwest's unilateral revisions.

**9.** The parties continue to dispute the financial consequences of the changes. Cook testified that the existing White Book offers better pen-sion benefits, eye care, life insurance, and higher "snap-back" pay to recently hired employees. He stated the paid lunch for day shift employees is valued at 6.1% of the company's payroll expense. He claimed Northwest's changes result in a 20–30% overall reduction in compensation. Northwest disputes these figures and claims that its proposed changes result in wage parity between White Book and Brown Book employees, and would cause immediate pay raises, varying between 3–52%, for the White Book employees. *See* Attachment 26 to Mr. Michael Fahey's Affidavit.

and is therefore invalid.[10] Third, the IAM's mediation request relates to members of two distinct classes or crafts (mechanics and COFPS personnel) and thus attempts to alter the class or craft boundaries in violation of the Act.[11] *Air Line Pilots Assoc. v. United*, 802 F.2d at 902–03 (union may not insist to impasse upon company reaching agreement with another craft).

■ Even assuming that Northwest's assertions are true and that they raise issues under the RLA, Northwest still may not avoid the statutory prohibition against unilateral action without first undertaking mediation. Self-help under the statute is a tactic of last resort. Northwest cites *General Drivers and Helpers Union, Local 554 v. Young & Hay Transp. Co.*, 522 F.2d 562 (8th Cir.1975), for the rule that under the NLRA an employer may unilaterally change wages and benefits when the union illegally insists to impasse on a proposal to alter a bargaining unit.[12] It is a great leap from that proposition to claim that the RLA permits unilateral economic action under the same circumstances, and no supporting authority is cited.

The RLA does not authorize self-help even when the dispute involves claims of improper bargaining or an overly broad request for mediation. Rather the entire thrust is to permit the NMB to intervene and attempt to work out an agreement. Exchanging proposals and holding negotiation conferences is "but the first step in Railway Labor Act procedures. Once they have been frustrated, one side to the dispute can move to the next tier of procedures ... [requesting that] the National Mediation Board [accept] jurisdiction of the controversy." *Brotherhood of Railroad*

*Trainmen v. Akron & B.B.R. Co.*, 385 F.2d 581, 597 (D.C.Cir.1967), *cert. denied*, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968), (a case relied on by Northwest). Mediation is to be attempted even in the face of the greatest reluctance and skepticism about success.

It may well be that the likelihood of successful mediation is marginal. That success of settlement may lie in the realm of possibility, rather than confident prediction, does not negative the good faith and validity of the Board's effort. The legislature provided procedures purposefully drawn out, and the Board's process may draw on them even to the point that the parties deem them "almost interminable."

What is voluntary about mediation, including mediation under this Act, is the decision to accept or reject the result available from the mediation process. What is involuntary about mediation under this Act is the obligation to engage in the mediation process even though a party is not unreasonable from his point of view in his conviction that further mediation is futile.

*International Association of Machinists v. National Mediation Board*, 425 F.2d 527, 541.

The public policy considerations stated in the previous opinion are still applicable. The overriding concern expressed by Congress in the RLA is maintenance of the status quo and avoidance of unilateral economic actions until mediation proves unsuccessful.

Based on the considerations already discussed, the balance of equities favors a preliminary injunction under the RLA.

---

**10.** Although Northwest provides authority under the NLRA that tying non-mandatory topics to mandatory issues is impermissible, it cites no case which imposes the same rule under the RLA.

**11.** The IAM argues that the COFPS employees and mechanics may be covered by the same agreement even though they belong to separate classes of employees. Northwest does not challenge this assertion, but seems to argue that it cannot be insisted on to impasse.

**12.** [I]t is simply beyond dispute that insistence by one party upon a nonmandatory subject of bargaining relieves the other party of any obligation to continue bargaining and allows implementation. When the IAM in its application for mediation continued its past insistence on a "Transition Agreement", the IAM's position was illegal and Northwest was the "innocent party [who] need not negotiate."
Defendant's Memorandum, December 3, 1987 p. 12, *citing General Drivers & Helpers*, 522 F.2d at 566.

## IV.

Northwest urges that Section 8 of the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.*, requires denial of the motion for injunctive relief.[13] *See Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes,* —— U.S. ——, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (no jurisdiction for federal court to enjoin secondary picketing); *Airline Pilots Association v. United Air Lines, Inc.,* 802 F.2d 886 (7th Cir.1986) (party seeking injunctive relief must comply with obligations of the RLA).

Northwest alleges that injunctive relief is prohibited by the Norris–LaGuardia Act because the union has failed to bargain in good faith and has orchestrated an illegal work slowdown.[14] Much of the documentary evidence and testimony provided by Northwest focuses on the alleged unclean hands of the IAM. Northwest's principal claim is that the IAM has instituted a slowdown under the guise of a "work-safe" program, to exert illegal economic pressure.

■ Northwest offered Exhibits 38, 39 and 40, accompanying reports and deposition transcripts, and the testimony of Lawson and Walker to prove the alleged slowdown. This evidence does give some support to Northwest's claim, but the evidence does not show that the IAM or its officers have orchestrated or participated in a slowdown. Proof of authorization, participation, or ratification is necessary under the Norris–LaGuardia Act,[15] and such proof is missing here. Furthermore, no employee has been discharged in Minneapolis/St. Paul for the alleged slowdown, and discharges in other cities are being contested. The problems regarding overtime have apparently abated. There was also evidence that other problems related to the merger contributed to delays and service problems. Shortages were noted in equipment, personnel, and baggage facilities, especially at the three major hubs— Minneapolis/St. Paul, Detroit, and Memphis. Increases in passenger and baggage volume and unavailability of tools or equipment also cause repair delays.

■ The Norris–LaGuardia Act does not bar the injunctive relief sought by the IAM to maintain the status quo and restrict self-help by all parties. Applying the Norris–LaGuardia Act to an RLA dispute is appropriate only where prohibiting injunctive relief would further the purposes of both Acts. *See Brotherhood of Railroad Trainmen v. Toledo, P. & W. R.R.,* 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944). Injunctive relief is permitted when necessary to enforce the "almost interminable" requirement that the RLA be exhausted before permitting self-help. *Brotherhood of Railroad Trainmen v. Akron,* 385 F.2d at 613–14; *Brotherhood of Railroad Carmen v. Chicago & Northwestern Railway Co.,* 354 F.2d 786 (8th Cir.1965); *Cox v. Northwest Airlines,* 319 F.Supp. 92 (D.Minn.1970). The Norris–LaGuardia Act must be accommodated with the RLA in disputes involving interstate carriers. Relief must be fashioned so that the obvious

---

**13.** Section 8 reads as follows:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108.

**14.** These allegations of unclean hands are part of Northwest's case against the IAM in a lawsuit it filed in the Western District of Tennessee. Discovery there is ongoing, but Northwest has not yet sought injunctive relief.

The testimony also revealed a company program of placing agents in the employee ranks to report on employee activities. Northwest acknowledges this practice, but contends that these agents are to distance themselves from union activities.

**15.** No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106 (1982).

purposes of both statutes are served. *See* Memorandum Opinion and Order November 24, 1987, at 9–10, n. 7.

After considering all issues raised by the parties, the court finds the movants entitled to a preliminary injunction.

### ORDER

Accordingly, based upon the above, and all the files, records and proceedings herein, IT IS HEREBY ORDERED that:

1. The motion for a preliminary injunction by the plaintiffs, International Association of Machinists and Aerospace Workers, AFL–CIO (IAM) and District Lodge 143, is granted, and defendant Northwest Airlines, Inc., is enjoined from unilaterally changing or modifying the rates of pay, rules and working conditions of its employees represented by the IAM, and all unilateral changes imposed by Northwest on or after November 22, 1987 shall be withdrawn.

2. The bond of $20,000 filed by the plaintiffs shall remain in place, and this order will remain in effect until further order of the court.