**LOCAL 808, BUILDING MAINTENANCE, SERVICE AND RAILROAD WORKERS, et al., Plaintiffs,**

v.

**NATIONAL MEDIATION BOARD, Defendant.**

**Civ. A. No. 88–1730 (HHG).**

United States District Court, District of Columbia.

May 19, 1989.

---

James T. Grady, General Counsel, Wilma B. Liebman, Atty., Intern. Broth. of Teamsters, Roland P. Wilder, Jr., Christy Concannon, Baptiste & Wilder, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Theodore C. Hirt and Thomas A. Bovard, Attys., U.S. Dept. of Justice, Civ. Div. (Ronald M. Etters, General Counsel Nat. Mediation Bd., of counsel), Washington, D.C., for defendant Nat. Mediation Bd.

Walter E. Zullig, Jr., General Counsel, Mary Ann Mills, Associate Counsel, Metro–North Commuter R. Co., New York City, Arnold B. Podgorsky, Gerst, Heffner, Foldes and Podgorsky, Washington, D.C., for defendant-intervenor Metro–North Commuter R. Co.

## OPINION

HAROLD H. GREENE, District Judge.

This case raises the question of how long the National Mediation Board (Board) may withhold arbitration of a labor dispute involving a labor union and a commuter railroad, on the basis that the Board is engaged in mediation, when no active mediation has been occurring for a very substantial period of time. The case is here on cross-motions for summary judgment.

### I

This saga began on July 9, 1985, when Local 808, Building Maintenance, Service and Railroad Workers (hereinafter Union)[1] served a notice on the Metro–North Commuter Railroad (Railroad)[2] pursuant to section 6 of the Railway Labor Act, 45 U.S.C. § 156,[3] proposing various changes in pay, rules, and working conditions of the Railroad's track workers.[4] Thereafter, the Railroad served its own section 6 notice on the Union. The conference phase of the process, during which the Union and the Railroad met for bargaining a number of times, lasted from August 1, 1985 to June 10, 1986, or approximately ten months. When the conferences did not succeed in resolving the dispute, the Union invoked the mediatory services of the Board on June 13, 1986, and five days later, on June 18, 1986, the dispute was docketed by the Board.

---

1. The International Brotherhood of Teamsters is also a plaintiff in this case.

2. The Railroad, which is engaged in the transportation of some 95,000 commuters daily in New York and Connecticut, is also a party, having intervened as a defendant.

3. The action is based on the Railway Labor Act, 45 U.S.C. §§ 151–188, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

4. The Railroad and the Union are parties to an agreement that was to be effective during the period January 1, 1983 through December 31, 1985. The Union claims that salaries and working conditions on the Metro–North Commuter Railroad Company are inferior to those on the comparable Long Island Railroad.

A number of mediation sessions, some attended by a mediator, some by a Board member, some by both, were held between October 29, 1986 and February 25, 1988, a period of sixteen months. The Railroad's final offer was made on February 25, 1988, but it was overwhelmingly rejected by the Union membership.[5] Six days after the rejection, on March 29, 1988, the Railroad served on the Union a new proposal that was substantially less favorable to the employees in proposed pay rates and conditions than the proposal than had been rejected.

On April 18, 1988, twenty-two months after the dispute had been docketed at the Board, the Union requested that the Board end the mediation phase [6] and instead proffer arbitration to the parties as well as the procedures provided in section 9A of the Act, 45 U.S.C. § 159a. *See infra.*[7] Specifically, the Union advised the Board that "the parties have reached the point where it is apparent that continued mediation will not result in a settlement. It is time to begin the procedures prescribed in § 9A of the Act; perhaps Emergency Board proceedings will lead to settlement."[8]

However, the Board refused to proceed to arbitration or to the section 9A proceedings. Indeed, as of June 24, 1988, the date the complaint was filed here, and as of the time of the briefing of the issues before this Court in October to December 1988,

the Board had still refused to initiate the arbitration process.[9] There was likewise no change in that status as of the time of oral argument on the pending motions and as of the time of the issuance of this Opinion.[10]

Thus, the dispute has been before the Board one month short of three years [11] and well over one year since the Union requested an end to mediation and the start of arbitration. The parties have not met privately in contract negotiations since June 10, 1986; no mediation sessions have been held since February 25, 1988; and each party has been adhering to its last stated position. The issue before the Court is whether, in that posture, the Board's refusal to proceed to the next, the arbitration step of the process, is arbitrary and may be made the subject of an appropriate judicial order.

II

Under the Railway Labor Act, disputes between labor and management are categorized as major or minor, the dispute here being a major dispute.[12] The Act's procedures for major disputes were described in *BRT v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969), in these terms:

> A party desiring to effect a change of rates of pay, rules, or working conditions

5. The vote was 411 to 12.

6. As discussed below, as long as the Board considers that it is in the mediation phase, none of the alternative procedures under the Act is available.

7. The Act contains strong inducements to engage in arbitration. Any party which refuses to do so loses the right to the aid and equity of a federal court. *Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western R.R.,* 321 U.S. 50, 63, 64 S.Ct. 413, 420, 88 L.Ed. 534 (1944).

8. Plaintiffs' Exhibit 10.

9. Although normally a court would not be justified in considering events taking place after the lawsuit was filed, *International Association of Machinists and Aerospace Workers v. National Mediation Board,* 425 F.2d 527, 542 (D.C.Cir. 1970); *Seaboard World Airways v. Local 851,* 501 F.Supp. 47, 50 (E.D.N.Y.1980), this rule is

logically not applicable where no active mediation occurs either before or after the initiation of the litigation. *See infra.*

10. Upon the Court's request of the parties to advise it whether any change had occurred in the status of the case, it was informed that there had been no change.

11. Three years is the term of labor agreements between the Railroad and the Union. Wages and benefits remain at the January 1985 levels. If there had been an agreement in 1986 following the expiration of the 1983–85 agreement, *see* note 4, *supra,* it, too, would have expired by now.

12. That is so because it is over proposed changes in the collective bargaining agreement. *See Elgin, J. & E.R.R. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). The Board does not have jurisdiction over minor disputes. 45 U.S.C. § 155 First (b).

must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President,' who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10.

In 1981, Congress amended the Act to add in section 9A a special procedure for major disputes involving rail carriers in commuter service. 45 U.S.C. § 159a. That special procedure, which may be invoked by either party to the dispute, or by the governor of any state through which the commuter rail service operates,[13] has the effect of extending by 240 days the status quo following the termination of mediation (unless the dispute is settled before then by voluntary agreement or arbitration). During that 240–day period, the National Mediation Board convenes two emergency boards, one to investigate and make recommendations, the other to select from the parties' final settlement offers the one it finds most reasonable. 45 U.S.C. §§ 159a(b), (c), 160, 159a(e)–(g).[14] However, until the Board declares under section 5 of the Act, 45 U.S.C. § 155 First, that an amicable settlement through mediation has been unsuccessful, there can be no recourse to arbitration or to the section 9A procedures.

In the instant case, neither arbitration nor the section 9A process has been invoked, even though section 5 of the Act requires that, when mediation efforts are unsuccessful, the Board "shall at once" endeavor to induce the parties to submit the controversy to arbitration. It is the Union's basic claim that mediation has proved to be unsuccessful, and that the Board is arbitrarily refusing to move to the arbitration phase. Accordingly, it requests that the Court order the Board to do so. Before considering the arguments in support of and in opposition to that request, it is necessary to recapitulate the law on the issues here as it has been laid down by the Supreme Court and the Court of Appeals.

### III

An examination of the leading cases plainly reveals that the mediation process was intended to be lengthy, and that court intervention to terminate that process was to be reserved for exceptional cases of Board dilatoriness or arbitrariness.

Thus, in *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees, AFL–CIO v. Florida East Coast Railway Co.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966), the Supreme Court stated that "the procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." 384 U.S. at 246, 86 S.Ct. at 1424. Three years later, the Court noted in *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (*Shore Line*), that a "crucial aspect of the Act [is] the power given to the parties and to representatives of the public to make the

---

**13.** Additionally, the President has the option of appointing his own emergency board whenever he is notified by the National Mediation Board that the dispute is such as to "threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the coun-

try of essential transportation service." 45 U.S.C. § 160.

**14.** Here again, penalties in the form of loss of benefits are provided in the statute for a party refusing to accept the emergency board recommendations. 45 U.S.C. § 159a(i), (j).

exhaustion of the Act's remedies an almost interminable process ... In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce." 396 U.S. at 149–50, 90 S.Ct. at 298–99.

The most exhaustive and authoritative decision rendered since that time is that of Judge Leventhal, speaking for the Court of Appeals for this Circuit, in *International Association of Machinists and Aerospace Workers v. National Mediation Board* (hereinafter *IAM*), 425 F.2d 527 (D.C.Cir. 1970). In that case, the Court of Appeals held preliminarily that courts must apply an extremely deferential standard of review to Board decisions. Said the court, the Board "is entitled to as strong a presumption as the legislature, that if any state of facts might be supposed that would support its action, these facts must be presumed to exist." 425 F.2d at 540. It then went on to state that:

> It may well be that the likelihood of successful mediation is marginal. That success of settlement may lie in the realm of possibility, rather than confident prediction, does not negative the good faith and validity of the Board's effort. The legislature provided procedures purposefully drawn out, and the Board's process may draw on them even to the point that the parties deem them "almost interminable." * * * However skeptical of success the court may be it

cannot obliterate even the slim chance of success that may ensue from exhaustion of the process entrusted by Congress to the Mediation Board.

425 F.2d at 541. To similar effect, *see Delaware & Hudson Railway Co. v. United Transportation Union*, 450 F.2d 603, 608 (D.C.Cir.1971) (*Delaware & Hudson*); *see also, Lan–Chile Airlines v. National Mediation Board*, 115 L.R.R.M. 3655, 3656 (S.D.Fla.1984), *appeal dismissed*, 749 F.2d 731 (11th Cir.1984).

### IV

It is in that environment of an endorsement of very lengthy mediation proceedings that the claims of the parties must be evaluated. Upon such evaluation, the Court concludes that, notwithstanding the legal principles summarized above, which are obviously binding on this Court[15] and must in any event be accorded the utmost deference and weight, it should here require the Board to proceed with the next, the arbitration phase of the process. That is so because the instant case differs from the previously decided cases in a number of respects, as follows.

First. The instant dispute has been in mediation for an unusually long period of time. The Board's procedures were first invoked in June 1986, and the dispute has thus now been pending before that agency for close to three years. The parties differ as to whether this period is longer than any other dispute before the Board, or whether it is merely longer than the average.

The Union, which concentrates its statistics on section 9A cases, contends that the average duration of such cases prior to their referral to an emergency board is 267 days, while the instant matter has now been pending for well over one thousand days, with no end in sight. According to the Union, only one other section 9A case in the Board's history has been pending as

---

**15.** The Union points out that the Court of Appeals' language in the *Delaware & Hudson* case relied on by the Board in support of its argu-

ment that the mediation effort was to be lengthy was dictum. Plaintiffs' Memorandum in Oppo-

long as this one.[16] The Board, on the other hand, concentrates on Railway Labor Act cases generally (without singling out those involving section 9A), and on that basis it has concluded that, at least as of December of last year, forty-three percent of the active mediations on its docket had been in that process for a longer period of time than the instant dispute.[17]

In the Court's view, the section 9A cases are the more appropriate category for comparison, not only because they were singled out by Congress for special treatment but also because in such cases the party resisting change is able under the statute to freeze the status quo by an extra 240 days. A very extended mediation period that must by law be followed by further settlement efforts (as in a section 9A case), rather than by a possible strike (as in a non-section 9A case), would seem on its face to be more unreasonable than one of equal duration that could almost immediately be followed by self-help with its inevitable disruptions and public inconveniences. To put it another way, the pursuit of mediation for an extended period may make more sense when the alternative is a possible strike within thirty days than when the alternative is continuation of the status quo for an additional eight months.

Second. Aside from the general statistics, it seems clear that mediation, without any foreseeable resolution, that lasts almost as long as the duration of the normal labor agreements between the parties (thirty-five months of mediation versus thirty-six months of contract) is extraordinary. That is particularly so where the burden of the delay falls entirely on one party, in this case the Union. It is the Union that is intent upon change; the Railroad is presumably perfectly happy with the status quo. Thus, the Board's argument that even in the present situation a lengthy mediation period is reasonable for it will, *inter alia*, give the parties an incentive to settle is illusory: under the Board's policy (*see infra*) only the Union has an incentive to settle; the incentive on the Railroad is to stand firm. Not only is the Board thus in this instance pursuing a one-sided policy,[18] but mediation is, almost by definition, doomed to failure.[19]

Third. The Board, through at least one member, has made it clear that it dislikes the section 9A procedure. According to affidavits submitted by the Union, Board Member Wallace, who was assigned to this dispute, informed Union representatives that that dispute would be held in mediation "indefinitely" in order to avoid recourse to the section 9A procedure which the Board "disfavors," and that the Union "[did] not have a right" to 9A procedures. *See* Pokof Affidavit, ¶ 7; Mahoney Affidavit, ¶ 20. That view directly collides with the statute for, as indicated above, section 5 provides that if an amicable settlement proves to be unsuccessful, the Board "shall at once" endeavor as its final required action to induce the parties to submit the controversy to arbitration and then presumably go on to the 9A procedures. Violation of the statutory mandate is of course tantamount to arbitrary action.

Fourth. Unlike the situation that prevailed in the cases that have previously been considered by the appellate courts,

sition to Defendant's Motions at 3. If that be true, it is dictum of a particularly powerful sort.

**16.** The Union claims that, with one exception, no 9A rail case has dragged on as long as this one with so little progress toward settlement, Pryor Declaration, ¶ 4, and that no other reported mediation cases involving maintenance of way employees has had such a prolonged period of mediation in the last twelve years before arbitration was offered by the Board. Memorandum of Points and Authorities at 15, Plaintiffs' Exhibit 14(c), Chart 3.

**17.** Barnes Declaration, ¶ 5. The Union has moved to strike portions of the Barnes declaration, contending that his statistical analysis is flawed in various ways and that he relied on records which the Board has failed to make available. Although the second of these contentions has some merit, the Court will deny the motion to strike because, for the reasons discussed above, the precise statistics are not critical to the outcome of this litigation.

**18.** That alone would not constitute a sufficient reason for court intervention. *See Shore Line, supra,* 396 U.S. at 149–50, 90 S.Ct. at 298–99.

**19.** In fact, the Railroad's last offer was regressive compared to its earlier positions.

absolutely nothing appears to be occurring in this case while in theory it is in mediation. According to the Union,[20] the parties to the dispute have not met privately since June 1986, and no mediation sessions have been held by the Board for the last fifteen months.[21]

By contrast, in *Delaware & Hudson, supra*, for example, one of the cases principally relied upon by the Board, the Board docketed the dispute on May 19, 1970, and it began mediation on June 30, 1970, six weeks later. On August 3, 1970, it requested the parties to proceed to arbitration. The carriers complied with the request but the union did not, and on August 10, 1970, less than two months after the mediation process had begun, the Board notified the parties that its mediatory efforts had failed and that it was terminating its services. 450 F.2d at 605.[22] Other cases appear to be similar insofar as the passage of time is concerned.[23]

On this issue, too, the *IAM* case is illuminating. The dispute there was docketed by the Board on December 23, 1968, but a mediator was not assigned until March 5, 1969—a time interval that the Court of Appeals characterized as "a delay that ill suits [the] need for expedition." 425 F.2d at 541. Ultimately, that court directed the District Court to dismiss the action, but not only was this on the basis of a record which showed an interval of less than eight months between Board cognizance of the dispute and the court's order requiring arbitration,[24] compared to almost three years in the instant case, but also, and perhaps of even greater importance, in *IAM*, unlike here, the Board was actually mediating.

In fact, the Court of Appeals stressed in *IAM* that, while "[t]he amount of time already spent in mediation was more than customary," this was accounted for by the fact that "this dispute involved a large number of issues, some of them complex ... [and a]greement had been reached on a number of issues to which substantial time had been given in mediation conference—overall approximately 40% of the issues had been resolved." 425 F.2d at 541.[25] By contrast, in the instant case, apparently no issues have been resolved during mediation because (1) the Railroad's last offer was less favorable to the Union than that which the membership had already rejected,[26] and

**20.** The Board is prohibited from reporting on the merits of any mediation or from disclosing any party's confidential bargaining position. *IAM*, 425 F.2d at 539; *see also*, 29 C.F.R. §§ 1208.3, 1208.5. Thus, the Board has not advised the Court whether the Union's claim is correct.

**21.** The Board argues, correctly, that the courts are not to become emeshed in the subjective mediation issues. However, the failure of the Board to engage in active mediation for well over a year is an objective fact.

The Board suggests that acceptance of the Union's position would be equivalent to a holding that the Board is to be enjoined when its position is merely unreasonable from the point of view of a party to the dispute. Reply Memorandum at 8. Such a standard would be clearly erroneous. However, the Board, like all agencies of government, is not immune from court process if its decisions are arbitrary and unreasonable based upon an objective appraisal of its actions.

**22.** The parties were required to maintain the status quo for an additional thirty days, and they agreed to refrain from self help for an additional five days, when the three railroads were struck.

**23.** While the Supreme Court's opinion in *Shore Line*, for example, does not provide a precise chronology of events, references to 30–day and 60–day periods, *see, e.g.*, 396 U.S. at 150–52, 90 S.Ct. at 299–300, suggest that the time periods involved were not anywhere near as long as those which have already elapsed in the instant case.

**24.** December 23, 1968 to August 4, 1969.

**25.** The Board recognizes that the *IAM* decision explained and thus modified the seeming prohibition on judicial review of Board mediations alluded to in *Switchmen's Union of North America v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), and *General Committee v. Missouri–Kansas–Texas Railroad Co.*, 320 U.S. 323, 337, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943). Motion to Dismiss, or, in the Alternative, for Summary Judgment at 23.

**26.** According to the Union, regressive bargaining—abandonment of stated bargaining position in favor of a position less advantageous to the other party—is virtually unknown in the railroad industry. Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 22 n. 9; Pryor Declaration at ¶ 14.

(2) no mediation sessions at all have been held by the Board for well over one year.[27]

The question then is whether, given that record—a very long period during which the parties are theoretically in mediation but where in actuality no mediation occurring—a court has the authority under the statute to require the Board to proceed to the next, the arbitration step. Notwithstanding the general language in the decisions discussed above, cautioning emphatically against imprudent or premature judicial intervention, the appellate courts have not held that such intervention is never warranted. Quite the contrary.

In *Delaware & Hudson*, the Court of Appeals said that "[w]hile the procedures of the Act are 'almost interminable,' the process is not completely 'interminable.' It does some time come to an end. Such a time has been reached in the situation before us." 450 F.2d at 608. And the Court went on to say,

> The Railway Labor Act defers and delays, but in the last analysis it does not deny, a Union's right to call a strike. That right to self help has been reached in the case before us. The courts are not free to terminate or qualify that right, except in pursuance of authority granted by Congress. No such authority appears in the wording of the Railway Labor Act. Any doctrine that the right to strike may be limited by implication must be carefully confined.

450 F.2d at 611.

Likewise, in *IAM, supra*, the court said that, in a case such as this, the union

> is asserting not merely a statutory right but the basic right to use economic weapons in a labor dispute. There are constitutional as well as common law underpinnings of the rights of employees to strike, and engage in peaceful picketing,

in order to improve terms and conditions of employment. Employers have correlative rights to institute changes deemed necessary for survival.

> The rights of self-help owned by both union and management have been preserved by Congress, albeit held in temporary abeyance. They survive, available for use when the statutory procedures to promote agreement are exhausted.

425 F.2d at 536. The Court of Appeals then went on to hold that in the "rare and unusual case where the complaint, as supported by objective facts, requires overturning the Mediation Board's judgment notwithstanding the vigorous presumption of validity, the court has jurisdiction to require the termination of the mediation process." 425 F.2d at 542–43. Moreover, said the court in language particularly apt with respect to the present situation, ". . . a rule of absolute immunity from judicial inquiry for the National Mediation Board would be tantamount to requiring the parties to stay frozen for an indefinite period even though no relevant public process was underway." 425 F.2d at 537.

In consideration of the facts involved in this case, and the considerations summarized above, the Court will require the Board to comply with the mandate of the statute—to proceed "at once" to the next stage, the proffer of arbitration pursuant to section 5, and, if that proves to be unsuccessful, to the emergency board procedure of section 9A.

## V

This Court does not enter this injunction lightly. The Supreme Court and the Court of Appeals have made it plain that such an order is to be issued only where the fact situation is an exceptional one.[28] The

---

**27.** The failure of the Board to hold mediation sessions for such a period of time diminishes, if it does not entirely vitiate, the force of its contention that it "necessarily knows more about the parties' bottom line negotiating positions than the Court does," and it also undermines the Board's assertion of various hypotheticals suggesting that no impasse has been reached in this

case. Motion to Dismiss, or, in the Alternative, for Summary Judgment at 20, 27–29.

**28.** According to the government, no court has heretofore ordered the Board to terminate mediation. Motion to Dismiss, or, in the Alternative, for Summary Judgment at 13.

Court is also cognizant of the fact that, at the end of the entire process—that is, if nothing positive occurs in the next eight months [29]—there looms the possibility of a work stoppage. Nevertheless, as long as the right of labor to strike and that of management to lock out its employees are available under the law, it does not behoove the Court to interpret the Railway Labor Act and the powers of the National Mediation Board thereunder in such a fashion as to render these resorts to self help forever unattainable and in any practical sense.[30]

For the reasons stated, the Court will order that, within twenty days [31] of the entry of this Opinion and the accompanying Order, the National Mediation Board shall cease mediation and proceed to proffer arbitration to the parties, to be followed, if necessary, by the procedure established by section 9A of the Act.

## ORDER

Upon consideration of plaintiffs' motion for summary judgment and injunctive relief, defendant National Mediation Board's motion to dismiss or, in the alternative, for summary judgment, and defendant-intervenor Metro–North's motion to dismiss and cross-motion for summary judgment, the oppositions and the replies thereto, the affidavits and other exhibits submitted to the Court, the argument of counsel, and the entire record herein, it is this 19th day of May, 1989, in accordance with an Opinion issued contemporaneously herewith

ORDERED that defendant-intervenor Metro–North's motion to dismiss and cross-motion for summary judgment be and it is hereby denied; and it is further

ORDERED that plaintiffs' motion for summary judgment be and it is hereby granted; and it is further

ORDERED that judgment be and it is hereby entered in favor of plaintiffs; and it is further

ORDERED that the National Mediation Board and its individual Members be and they are hereby enjoined to cease mediation with respect to the dispute between Local 808, Building Maintenance, Service and Railroad Workers and the Metro–North Commuter Railroad within twenty days of the entry of this Order, and at that time proceed to proffer arbitration and the procedures established by section 9A of the Railway Labor Act.

29. The contrary may be anticipated. Thus, it may be expected that arbitration or emergency board efforts during that period will yield results. If that does not occur, there is the remedy of a Presidential emergency board, and as a last resort, the enactment of legislation.

30. The Board argues that the issuance of an order to proceed to the arbitration step in this case would be tantamount to an abandonment of the deferential standard prescribed in the appellate cases and a holding that the Board must justify the continuation of mediation once plaintiffs have made out a prima facie case that mediation has taken longer than the norm. Defendant's Reply at 3. That formulation is erroneous. The Court is proceeding under the deferential standard the appellate decisions require; but it concludes that, even under that standard, the freeze must be ended, if not now, eight months from now, lest the Board effectively deprive the Union of its basic right to self help.

31. This twenty-day delay will permit the Board to make one additional, serious effort at mediation, or, alternatively, to file an appeal and to apply to the Court of Appeals for a stay should it decide to do so.